STATE OF NORTH CAROLINA v. RICHARD EUGENE CAGLE AND
MICHAEL PAUL SCOTT

No. 336A95

(Filed 24 July 1997)

## 1. Evidence and Witnesses § 2908 (NCI4th)— capital murder— killing cat—admissible

There was no abuse of discretion in a capital prosecution for first-degree murder in the introduction of evidence that defendant Cagle had killed a cat by smashing its head against a wall and against a fish tank where, in response to pretrial written motions by both defendants, the court barred the evidence under N.C.G.S.

§ 8C-1, Rule 403 but noted that it would reconsider if doors were opened; the court reconsidered following cross-examination and after hearing arguments from all parties; and the evidence was relevant to explain or rebut evidence elicited by defendant on cross-examination of the State's witnesses. Also, the court instructed the jurors to consider the evidence only to the extent they found it bore on defendant Cagle's state of mind, intent, malice or lack of malice.

**Am Jur 2d, Evidence §§ 340-342.**

**2. Homicide § 669 (NCI4th)— first-degree murder—voluntary intoxication—requested instruction not given—no error**

There was no error in a prosecution for first-degree murder, robbery, and conspiracy in the trial court's failure to give defendant Cagle's requested instruction on voluntary intoxication where the evidence showed that defendant Cagle was able to have a predetermined plan, communicate the plan to another, execute the plan, flee the murder scene, and use the alibi. The evidence failed to show that at the time of the killing Cagle's mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill.

**Am Jur 2d, Homicide § 517.**

**3. Criminal Law § 1389 (NCI4th Rev.); Appeal and Error § 504 (NCI4th)— capital sentencing—mitigating circumstance— impaired    capacity—instructions—invited    error—not prejudicial**

Any error in a capital prosecution for first-degree murder, robbery, and conspiracy in the court's instruction on the impaired capacity mitigating circumstance as to defendant Cagle was invited and not subject to review where the instruction was requested and agreed to by Cagle's counsel at the charge conference. Moreover, any error was harmless in that defendant contended on appeal that the instruction forced the jury to find both intoxication and narcotics ingestion before finding the mitigating circumstance, but the evidence was uncontradicted that Cagle consumed alcohol and smoked marijuana on the night of the murder. Also, the jury was instructed to consider mental illness in relation to several other mitigating circumstances. N.C.G.S. § 15A-2000(f)(6).

STATE v. CAGLE

[346 N.C. 497 (1997)]

Am Jur 2d, Appellate Review §§ 715, 716; Criminal Law §§ 598, 599.

**4. Criminal Law §§ 1375, 1392 (NCI4th Rev.)— capital sentencing—instructions—definition of mitigating circumstances**

The trial court did not err in a capital sentencing hearing in its definition of mitigating circumstance and by not explaining several nonstatutory mitigating circumstances. The court's instructions concerning both the definition of mitigating circumstance and the jury's duty to consider any circumstance arising from the evidence were substantially identical to the pattern jury instructions and to instructions held to be correct in other cases. The nonstatutory mitigating circumstances submitted to the jury were drafted by defendant, defendant did not object to the court's instructions on these circumstances, and the instructions on nonstatutory mitigating circumstances were clear and did not minimize the importance of the circumstances.

Am Jur 2d, Criminal Law §§ 598, 599.

**5. Criminal Law § 690 (NCI4th Rev.)— capital sentencing—peremptory instruction—nonstatutory mitigating circumstance**

There was no error in a capital sentencing proceeding in the court's peremptory instructions on nonstatutory mitigating circumstances where the court instructed the jurors that they could refuse to find the circumstances, which all of the evidence supported, if they did not deem the circumstances to have mitigating value.

Am Jur 2d, Criminal Law §§ 598, 599; Trial § 865.

**6. Criminal Law § 1375 (NCI4th Rev.)— capital sentencing—instruction on sympathy or mercy—refused—no error**

The trial court did not err in a capital sentencing proceeding by denying defendant's request for an instruction that the jury may base its sentencing recommendation upon sympathy or mercy where the court submitted the statutory catchall mitigating circumstance after proper instructions to the jury.

Am Jur 2d, Trial §§ 1119, 1445-1447.

Instructions to jury: Sympathy to accused as appropriate factor in jury consideration. 72 ALR3d 842.

**7. Criminal Law § 1402 (NCI4th Rev.)— death sentence—not disproportionate**

A sentence of death was not disproportionate where the record fully supports the aggravating circumstance found by the jury, the failure to find certain submitted mitigating circumstances was a rational result from the evidence, there is no indication that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary consideration, and the case is more similar to certain cases in which death sentences were found proportionate than to those where it was found disproportionate or to those in which juries have consistently returned recommendations of life imprisonment. Although defendant Cagle argues that most robbery-murder defendants receive a life sentence, defendant was convicted on the theory of premeditation and deliberation as well as under the felony murder rule, indicating a more cold-blooded and calculated crime; the fact that the murder was committed in the victim's home is significant, as is the fact that defendant fled while the victim was still alive and suffering and that defendant never attempted to ensure that the victim received medical assistance; defendant was twenty-five years old while the defendant in *State v. Young*, 312 N.C. 669, was nineteen; defendant delivered the fatal stab wounds; and the evidence suggests that the crime was motivated in part by prejudice toward homosexuals.

**Am Jur 2d, Criminal Law § 628.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like—post-*Gregg* cases. 63 ALR4th 478.**

**8. Evidence and Witnesses § 1134 (NCI4th)— murder and robbery—codefendant killing cat—admissible**

The trial court did not err as to defendant Scott in a prosecution for first-degree murder, robbery, and conspiracy by admitting evidence of the killing of a cat by a codefendant. Defendant Scott's Confrontation Clause rights were not violated because the evidence was not an out-of-court statement but was trial testimony and defendant Scott had the opportunity to cross-examine.

**Am Jur 2d, Criminal Law §§ 723, 729; Evidence § 751.**

**9. Criminal Law §§ 339; 574 (NCI4th Rev.)— murder and robbery—codefendant killing cat—severance and mistrial denied**

The trial court did not abuse its discretion in a prosecution for robbery and murder by denying defendant Scott's motion for severance and a mistrial after the trial court admitted evidence concerning a codefendant killing a cat. Although Scott argues that it was probative only of his codefendant's intent, Scott was convicted of first-degree murder only under the felony-murder rule, which does not require intent to kill. The introduction of the evidence against defendant Cagle about Cagle killing the cat could not have denied defendant Scott a fair trial.

**Am Jur 2d, Trial §§ 164-166.**

**10. Criminal Law § 475 (NCI4th Rev.)— murder and robbery—prosecutor's argument—bruising after death—no error**

The prosecutor's comments in a prosecution for murder and robbery concerning bruising after death did not so infect defendant Scott's trial with unfairness as to make the resulting conviction a denial of due process where defendant Scott contended that the prosecutor argued medical facts not in evidence (that bruising stops at death), but defendant Scott was not prejudiced even if the argument was not a reasonable inference because it is irrelevant under the theory of acting in concert whether he committed any positive act in the assault.

**Am Jur 2d, Trial §§ 609, 632.**

**11. Criminal Law § 475 (NCI4th Rev.)— murder and robbery—prosecutor's argument—killing of cat by codefendant—limiting instruction disregarded**

Defendant Scott's trial was not so infected with unfairness as to make the resulting conviction a denial of due process where he contended that the prosecutor improperly argued that the killing of a cat by a codefendant should be considered as evidence against Scott despite an instruction limiting the evidence to defendant Cagle. Intent to kill was not an element of Scott's felony murder conviction and he could not have been prejudiced by any evidence of his intent.

**Am Jur 2d, Criminal Law § 825; Homicide § 560.**

STATE v. CAGLE

[346 N.C. 497 (1997)]

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death as to defendant Cagle and a judgment imposing a sentence of life imprisonment as to defendant Scott entered by Weeks, J., on 15 June 1995 in Superior Court, Cumberland County, upon jury verdicts of guilty of first-degree murder. Defendants' motions to bypass the Court of Appeals as to additional judgments imposed as to each defendant for robbery with a dangerous weapon and conspiracy to commit robbery with a dangerous weapon were allowed on 15 October 1996. Heard in the Supreme Court 14 April 1997.

*Michael F. Easley, Attorney General, by John G. Barnwell, Assistant Attorney General, for the State.*

*Richard B. Glazier for defendant-appellant Cagle.*

*James M. Walen for defendant-appellant Scott.*

ORR, Justice.

At a joint trial, the jury found defendant Cagle guilty of robbery with a dangerous weapon, conspiracy to commit robbery with a dangerous weapon, and first-degree murder on the basis of premeditation and deliberation and under the felony murder rule. The jury found defendant Scott guilty of robbery with a dangerous weapon, conspiracy to commit robbery with a dangerous weapon, and first-degree felony murder. Following a capital sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended a sentence of death for defendant Cagle and a sentence of life imprisonment for defendant Scott. The judge sentenced each defendant accordingly. Cagle was also sentenced to a term of ten years' imprisonment for his conviction of conspiracy to commit robbery with a dangerous weapon and to a consecutive term of forty years' imprisonment for his conviction of robbery with a dangerous weapon. Scott was also sentenced to a term of three years' imprisonment for his conviction of conspiracy to commit robbery with a dangerous weapon, and the judgment against him for robbery with a dangerous weapon was arrested as the underlying felony upon which his felony murder conviction was based.

The evidence presented at trial tended to show the following facts, based substantially on the testimony of Ryan Christopher Jones. In November of 1993, defendant Cagle and his girlfriend, Jamie Kass, were living together at the Cape Fear Motel in Fayetteville,

North Carolina. Defendant Scott and Ryan Christopher Jones were magazine salesmen for Sun Circulation and were also staying at the Cape Fear Motel. On the evening of 4 November 1993, Cagle left Kass in the motel room to rest while he went across the street to a nightclub called "The Oz Club," which was considered to be a gay bar. Subsequently, Kass spoke with Scott and Jones at the motel. They also went to the Oz Club, where defendant Cagle was playing pool with Dennis Craig House, the victim.

After Cagle and House finished playing pool, House drove his truck to the motel; Cagle, Scott, Jones, and Kass walked. Kass testified that while they were walking to the motel, Cagle, Scott, and Jones joked about "rolling a fag," which she understood to mean taking money from a homosexual. Jones testified that during the walk, Cagle said he knew the combination to House's safe, he knew that House had about $4,000 and a pound of marijuana, and he suggested that they rob him. Jones testified that he understood from the conversation that they were going to rob House.

The group went to Cagle and Kass' motel room, where Kass rested on the bed, and the others drank alcohol and talked. Cagle used a tatoo gun to draw a tatoo on Jones. Whenever House stepped out of the room, the joking about "rolling a fag" continued. At approximately 2:00 a.m., Cagle, Scott, Jones, and House decided to leave the motel and drive to House's home while Kass went to sleep in the motel room. Jones testified that Cagle and House got into House's truck first while Jones and Scott stayed in the motel room and argued about who was going to take a knife that Kass had there. After Scott took the knife, he and Jones got into the truck, and House drove them all to his trailer.

At House's trailer, the group drank alcohol and smoked marijuana. According to Jones' testimony, at one point, Jones and Scott were sitting in the living room while Cagle and House were in the back room. Scott told Jones that the plan was for Jones to stab House while House was performing oral sex on Cagle. Shortly after that conversation, Cagle walked out of the back room carrying a cat by the neck. Jones testified that Cagle slammed the cat's head against the wall, and the cat's head split open. Cagle then bashed the cat's head on the fish tank. Then Cagle sat on the couch, and House entered the room. Next, Cagle followed Jones to the bathroom, gave him a knife, and told him that "he was gonna get [House] to give him oral sex and [Jones] was supposed to stab him."

According to Jones' testimony, he waited in the bathroom while Cagle returned to the living room. When Jones subsequently entered the living room, he saw Cagle lying on the couch and House performing oral sex on Cagle. Cagle reached out to grab Jones by the belt, and Jones stabbed House in the back once. Jones pulled the knife out and dropped it on the ground, and Cagle picked it up. House said, "Why are you guys doing this? I'll give you anything." House then lunged and grabbed Jones, and Scott began punching House in the head. Jones pulled away from House. Then Cagle stabbed House three or four times in the chest and dropped the knife on the ground. Scott tried to hit House with a bowling ball. While Jones, Scott, and House were wrestling, Cagle hit House with something that looked like either a fireplace poker or a pool cue, according to the testimony. Next, Cagle, Scott, and Jones ran toward the back room, where Cagle said, "Go finish him, go kill him." Cagle, Scott, and Jones ran out the front door, with Jones picking up the knife as he ran through the living room. The only item they took from House's home was a camera that Cagle picked up.

House ran to the home of his neighbor, Roger Ayscue, and knocked on the door. When Ayscue let him in, House collapsed and said, "Roger, they are trying to kill me." Ayscue looked out his window and saw Cagle and Scott leaving House's trailer. House ultimately died from stab wounds in the chest.

While fleeing, Cagle, Jones, and Scott discussed an alibi. They decided to tell police that they got in a fight at a keg party and that House left with another man. Shortly after leaving the murder scene, they reached a house and knocked on the door. Elizabeth Hales answered the door, and Cagle asked to use her phone to call a cab because their car had broken down. Hales refused, but told them she would call a cab for them. Hales called a cab company and the police. Cagle, Jones, and Scott then began walking down the road. A deputy sheriff responding to Hales' call spotted them and asked them what had happened. Cagle said they had been to a keg party, and their car had broken down. Cagle said the blood on his pants was from a fight at the keg party. The deputy sheriff then arrested Cagle, Jones, and Scott.

## ISSUES RAISED BY DEFENDANT CAGLE

## GUILT-INNOCENCE PROCEEDING

### I.

[1] Defendant Cagle first contends that the trial court erred by allowing the introduction of evidence about Cagle's killing of the cat by smashing its head against a wall and against a fish tank in House's home just prior to the murder. Defendant argues that the evidence was inadmissible under Rule 401 of the North Carolina Rules of Evidence because it was not relevant and that the evidence was inadmissable under Rule 403 because any probative value was substantially outweighed by the risk of prejudice or confusion of the issues. We disagree.

Prior to trial, both defendants filed written motions to bar any evidence related to the killing of the cat. The court granted the motions based on Rule 403, finding that "any probative value the evidence might have is substantially outweighed by the danger or risk of prejudice or confusion of the issues." However, the court noted that it would reconsider its ruling during the trial if any "doors were opened" to the introduction of the excluded evidence. Following the defense cross-examination of State's witnesses Ryan Jones and Cumberland County Sheriff's Department Sergeant Durwood Cannon, the court reversed its earlier ruling and found that the defense had opened the door to the introduction of evidence about the killing of the cat. The court found that Rule 403 no longer prohibited admission of the evidence. The court stated that the evidence now had probative value, "as it bears on the question of intent, the state of mind, or in terms of showing a complete picture or context for the jury to understand the evidence in this case." The State then introduced such evidence through the testimony of three witnesses: Jones described Cagle's killing of the cat; Sergeant Cannon testified about viewing the dead cat, blood evidence regarding the cat, and a photograph of the dead cat; and Cumberland County Sheriff's Department Detective Sergeant Ray Wood testified about the photograph of the dead cat and the evidence regarding the cat that was found by law enforcement officers at the scene.

After reviewing the transcript, we conclude that the trial court did not err in ruling that defense counsel opened the door to introduction of the evidence about the killing of the cat. "The State has the right to introduce evidence to rebut or explain evidence elicited by

defendant although the evidence would otherwise be incompetent or irrelevant." *State v. Johnston,* 344 N.C. 596, 605, 476 S.E.2d 289, 294 (1996); *see also State v. Alston,* 341 N.C. 198, 461 S.E.2d 687 (1995), *cert. denied,* —— U.S. ——, 134 L. Ed. 2d 100 (1996); *State v. Albert,* 303 N.C. 173, 277 S.E.2d 439 (1981). "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of North Carolina, by Act of Congress, by Act of the General Assembly or by these rules. Evidence which is not relevant is not admissible." N.C.G.S. § 8C-1, Rule 402 (1992). " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1992). "We have interpreted Rule 401 broadly and have explained on a number of occasions that in a criminal case every circumstance calculated to throw any light upon the supposed crime is admissible and permissible." *State v. Collins,* 335 N.C. 729, 735, 440 S.E.2d 559, 562 (1994).

Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

N.C.G.S. § 8C-1, Rule 403 (1992). "Necessarily, evidence which is probative in the State's case will have a prejudicial effect on the defendant; the question is one of degree." *State v. Weathers,* 339 N.C. 441, 449, 451 S.E.2d 266, 270 (1994). Relevant evidence is admissible "unless the judge determines that it must be excluded, for instance, because of the risk of 'unfair prejudice.' " *State v. Mercer,* 317 N.C. 87, 94, 343 S.E.2d 885, 889 (1986). " 'Unfair prejudice,' as used in Rule 403, means 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, as an emotional one.' " *State v. DeLeonardo,* 315 N.C. 762, 772, 340 S.E.2d 350, 357 (1986) (quoting N.C.G.S. § 8C-1, Rule 403 commentary (Supp. 1985)). "Whether or not to exclude evidence under Rule 403 of the Rules of Evidence is a matter within the sound discretion of the trial court and its decision will not be disturbed on appeal absent a showing of an abuse of discretion." *State v. McCray,* 342 N.C. 123, 131, 463 S.E.2d 176, 181 (1995). "A trial court may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it

STATE v. CAGLE

[346 N.C. 497 (1997)]

could not have been the result of a reasoned decision." *State v. Hayes*, 314 N.C. 460, 471, 334 S.E.2d 741, 747 (1985).

A careful review of the transcript reveals that during the cross-examination of Jones, defense counsel implied that Jones acted independently when he stabbed House, that any discussion of harming House was merely a joke rather than a serious plan, and that Cagle had no actual intention of following through with the plan to stab House. The cross-examination of Sergeant Cannon involved questions about blood evidence that may have been the result of the killing of the cat. We conclude that the evidence about Cagle's killing of the cat was relevant to explain or rebut the evidence elicited by defendant through cross-examination of the State's witnesses. The court did not abuse its discretion in concluding that the probative value of the evidence was not substantially outweighed by the risk of prejudice or confusion of the issues. The court's reconsideration of its pretrial decision was made after hearing arguments from all parties. Also, the court instructed the jurors to consider the evidence only "to the limited extent that you find that it bears on the defendant Cagle's state of mind, intent, malice or lack of malice." This assignment of error is overruled.

## II.

[2] Defendant Cagle next contends that the trial court erred in failing to instruct the jury, as requested, on the defense of voluntary intoxication. We disagree.

A defendant who wishes to raise an issue for the jury as to whether he was so intoxicated by the voluntary consumption of alcohol that he did not form a deliberate and premeditated intent to kill has the burden of producing evidence, or relying on evidence produced by the state, of his intoxication. Evidence of mere intoxication, however, is not enough to meet defendant's burden of production. He must produce substantial evidence which would support a conclusion by the judge that he was so intoxicated that he could not form a deliberate and premeditated intent to kill.

The evidence must show that at the time of the killing the defendant's mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill. In absence of some evidence of intoxication to such degree, the court is not required to charge the jury thereon.

*State v. Strickland,* 321 N.C. 31, 41, 361 S.E.2d 882, 888 (1987) (quoting *State v. Medley,* 295 N.C. 75, 79, 243 S.E.2d 374, 377 (1978)).

*State v. Mash,* 323 N.C. 339, 346, 372 S.E.2d 532, 536 (1988) (citations omitted).

Cagle argues that he met this burden because the evidence showed (1) that on the night of the murder, he consumed significant amounts of alcohol and smoked marijuana, (2) that he got drunk easily, and (3) that nobody had discussed any intent to kill House when they made the plan to rob him prior to going to his home. However, the defense of voluntary intoxication depends not on the amount of alcohol consumed, but on its effect on the defendant's ability to form the specific intent to kill after premeditation and deliberation. *See id.* Also,

> [p]remeditation means that defendant formed the specific intent to kill the victim for some length of time, however short, before the actual killing. *State v. Myers,* 299 N.C. 671, 677, 263 S.E.2d 768, 772 (1980). Deliberation means that defendant carried out the intent to kill in a cool state of blood, "not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation." *State v. Hamlet,* 312 N.C. 162, 170, 321 S.E.2d 837, 842-43 (1984).

*State v. Arrington,* 336 N.C. 592, 594, 444 S.E.2d 418, 419 (1994). Thus, defendant Cagle could have formed the specific intent to kill based on premeditation and deliberation that occurred at House's home, moments before the murder, even though he had no such intent when the plan to rob House was originally made.

After reviewing the transcript, we conclude that the evidence failed to show that at the time of the killing, defendant Cagle's mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill. Jones testified that during a conversation between him and Cagle in the bathroom prior to the murder, Cagle told him the plan. According to Jones' testimony, Cagle said that he was going to get House to perform oral sex on him and that Jones was supposed to stab him. Jones further testified that when he reentered the living room, House was performing oral sex on Cagle in accordance with the plan. Jones also testified that after the assault on House, Cagle, Jones, and Scott ran to the back of the trailer, where "[Cagle] was say-

ing, 'go finish him, go finish him, go kill him.' " After Cagle, Jones, and Scott ran away through the woods and planned an alibi story, they came to the home of Elizabeth Hales. Hales testified that Cagle came to her door and asked to use the phone to call a cab because they had had car trouble. Jones testified that when they were first stopped by a police officer, Cagle told the officer the alibi story that they had planned.

Thus, the evidence shows that Cagle was able to have a predetermined plan, communicate the plan to Jones, execute the plan, flee from the murder scene, and use the alibi in talking with Hales and a police officer. Defendant failed to meet his burden of production, and the trial court committed no error in refusing to give an instruction on voluntary intoxication.

## SENTENCING PROCEEDING

### III.

[3] Defendant Cagle next assigns error to a part of the jury charge in the sentencing proceeding in which the court instructed the jurors to find the N.C.G.S. § 15A-2000(f)(6) mitigating circumstance if they found that Cagle "had consumed beer at the Oz Club and Jack Daniels whiskey at the victim's residence, had smoked marijuana at both the Oz Club and the victim's residence and that this impaired his capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law." Cagle argues that this instruction was error because it forced the jury to make a finding that both intoxication and narcotics ingestion existed before the jury could find this mitigating circumstance and because it failed to mention consideration of mental illness.

This instruction was requested and agreed to by Cagle's defense counsel at the charge conference. Therefore, if there was error in the charge, it was invited error and not subject to review. *See State v. Harris*, 338 N.C. 129, 150, 449 S.E.2d 371, 380 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 752 (1995). We note, however, that any error in the charge was harmless. The evidence was uncontradicted that Cagle consumed alcohol and smoked marijuana on the night of the murder. Also, the jury was instructed to consider mental illness in relation to several other mitigating circumstances. *See State v. Rouse*, 339 N.C. 59, 104, 451 S.E.2d 543, 568 (1994), *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 60 (1995). For the foregoing reasons, this assignment of error is overruled.

STATE v. CAGLE

[346 N.C. 497 (1997)]

## IV.

**[4]** Defendant Cagle next contends that the court defined "mitigating circumstance" too narrowly during the jury charge and that the court improperly minimized the importance of several nonstatutory mitigating circumstances by failing to give an explanation of those circumstances. We disagree.

The court's instructions concerning both the definition of "mitigating circumstance" and the jury's duty to consider any circumstance arising from the evidence which the jury deemed to have mitigating value were substantially identical to the pattern jury instructions, *see* N.C.P.I.—Crim. 150.10 (1996), and to the instructions held to be a correct statement of the law and free from error in *State v. Conaway*, 339 N.C. 487, 533-34, 453 S.E.2d 824, 853-54, *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 153 (1995), and *State v. Robinson*, 336 N.C. 78, 122, 443 S.E.2d 306, 328 (1994), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995).

The nonstatutory mitigating circumstances submitted to the jury were drafted by defendant, and defendant did not object to the court's instructions on these circumstances. After reviewing the transcript, we conclude that the court's instructions on the nonstatutory mitigating circumstances were clear and did not minimize the importance of the circumstances. This assignment of error is overruled.

## V.

**[5]** Defendant Cagle next assigns error to the court's peremptory instructions on nonstatutory mitigating circumstances. The court instructed the jurors that they could refuse to find the circumstances, which all of the evidence supported, if they did not deem the circumstances to have mitigating value. Cagle argues that this instruction unconstitutionally allowed the jury to refuse to consider relevant mitigating evidence in violation of *Lockett v. Ohio*, 438 U.S. 586, 605, 57 L. Ed. 2d 973, 990 (1978). As defendant concedes, this Court has previously rejected this argument. *E.g., State v. Lynch*, 340 N.C. 435, 474-76, 459 S.E.2d 679, 699-700 (1995), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 558 (1996); *State v. Fullwood*, 323 N.C. 371, 395-97, 373 S.E.2d 518, 533-34 (1988), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 602 (1990). Even if jurors find from uncontroverted and manifestly credible evidence that a nonstatutory mitigating circumstance exists, the jurors may reject the nonstatutory mitigating circumstance if they do not deem it to have mitigating

value. *State v. Lynch,* 340 N.C. at 475-76, 459 S.E.2d at 700; *State v. Green,* 336 N.C. 142, 173-74, 443 S.E.2d 14, 32-33, *cert. denied,* 513 U.S. 1046, 130 L. Ed. 2d 547 (1994); *State v. Gay,* 334 N.C. 467, 492, 434 S.E.2d 840, 854 (1993). This rule does not allow jurors to refuse to consider relevant mitigating evidence. This assignment of error is overruled.

## VI.

[6] Defendant Cagle also contends that the trial court erred in denying defendant's written request for an instruction that the jury may base its sentencing recommendation "upon any sympathy or mercy you may have for the defendant that arises from the evidence presented in this case." This Court has consistently rejected defendant's argument on this issue. *See State v. Wooten,* 344 N.C. 316, 337, 474 S.E.2d 360, 372 (1996), *cert. denied,* —— U.S. ——, 137 L. Ed. 2d 348 (1997); *State v. Hill,* 331 N.C. 387, 421, 417 S.E.2d 765, 782 (1992), *cert. denied,* 507 U.S. 924, 122 L. Ed. 2d 684 (1993). As this Court held in *State v. Hill,* because the trial court submitted the statutory catchall mitigating circumstance after proper instructions to the jury, the court did not err in declining to give defendant's requested instruction. This assignment of error is overruled.

## VII.

[7] We now turn to the duties reserved by N.C.G.S. § 15A-2000(d)(2) exclusively for this Court in capital cases. We have examined the record, transcripts, and briefs in the present case and conclude that the record fully supports the aggravating circumstance found by the jury, that the murder was committed by defendant Cagle during the commission of or an attempt to commit robbery with a dangerous weapon, N.C.G.S. § 15A-2000(e)(5) (Supp. 1996). We also find that the jury's failure to find certain submitted mitigating circumstances was a rational result from the evidence. Further, we find no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary consideration. We must now turn to our final statutory duty of proportionality review.

Proportionality review is designed to "eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden,* 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied,* 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). In conducting proportionality review, we determine whether "the sentence of death in the present case is excessive or disproportionate to the penalty

imposed in similar cases considering both the crime and the defendant." *State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983); *accord* N.C.G.S. § 15A-2000(d)(2). We do not conclude that the imposition of the death penalty in this case is aberrant or capricious.

In our proportionality review, it is proper to compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum*, 334 N.C. 208, 433 S.E.2d 144 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). It is also proper for this Court to compare this case with the cases in which we have found the death penalty to be proportionate. *Id.* Although we review all of the cases when engaging in this statutory duty, we will not undertake to discuss or cite all of those cases each time we carry out that duty. *Id.* This case is distinguishable from each of those cases in which this Court has found the death penalty disproportionate.

Defendant Cagle argues that most robbery-murder defendants receive a life sentence and points out that four of the death sentences that this Court has found to be disproportionate were robbery-murder cases. However, in three of those cases, *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983), the defendant either pled guilty or was convicted by the jury solely under the theory of felony murder. Here, defendant was convicted on the theory of premeditation and deliberation as well as under the felony murder rule. We have said that "[t]he finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). Defendant argues that this factor alone is insufficient to support a holding that a death sentence is proportionate. However, there are other significant factors that distinguish this case from those in which the death sentence was held to be disproportionate.

The fact that the murder was committed in the victim's home is one significant factor. As this Court has consistently stated:

The sanctity of the home is a revered tenet of Anglo-American jurisprudence. . . . And the law has consistently acknowledged the expectation of and right to privacy within the home. This crime shocks the conscience, not only because a life was senselessly taken, but because it was taken by the surreptitious inva-

sion of an especially private place, one in which a person has a right to feel secure.

*State v. Brown,* 320 N.C. 179, 231, 358 S.E.2d 1, 34 (citations omitted), *cert. denied,* 484 U.S. 970, 98 L. Ed. 2d 406 (1987).

Another significant factor in this case is the fact that defendant Cagle fled while the victim was still alive and suffering, and he never attempted to ensure that the victim received medical assistance. "We have found lack of remorse or pity and the defendant's cool actions after the murder to be indications that the death sentence was not disproportionate. *State v. Syriani,* 333 N.C. 350, 428 S.E.2d 118, *cert. denied,* 510 U.S. 948, 126 L. Ed. 2d 341 (1993)." *State v. Norwood,* 344 N.C. 511, 541, 476 S.E.2d 349, 363-64 (1996) (holding death sentence proportionate where the defendant, having set the victim on fire, did nothing to procure medical assistance, to inquire into the victim's condition, or to express remorse to the victim), *cert. denied,* —— U.S. ——, 137 L. Ed. 2d 500 (1997); *cf. State v. Bondurant,* 309 N.C. 674, 694, 309 S.E.2d 170, 182-83 (1983) (holding death sentence disproportionate where immediately after he shot the victim, the defendant drove the victim to the hospital).

Defendant also argues that his death sentence should be held to be disproportionate because the facts of this case are very similar to the facts of *State v. Young,* 312 N.C. 669, 325 S.E.2d 181 (1985), in which the death sentence was held to be disproportionate. This Court summarized the facts of *State v. Young* in *State v. Carter,* 342 N.C. 312, 464 S.E.2d 272 (1995), *cert. denied,* —— U.S. ——, 134 L. Ed. 2d 957 (1996):

In *Young* the defendant, age nineteen, and two companions went to the victim's home and robbed and killed him. Defendant stabbed the victim twice, and one of his companions "finished him" by stabbing him five or six more times. The three young men then stole money and valuable coins and fled the scene.

*Id.* at 329-30, 464 S.E.2d at 283. We concluded that *State v. Carter* was distinguishable from *State v. Young,* in part, because of the ages of the defendants: In *State v. Young,* the defendant was nineteen years old; in *State v. Carter,* the defendant was twenty-four years old. *Id.* The case before us is likewise distinguishable because defendant Cagle was twenty-five years old at the time of the murder.

This case is also distinguishable from *State v. Young* because in *State v. Young,* although the defendant stabbed the victim twice, one

of his companions "finished him" by stabbing him five or six more times. In contrast, the evidence in the case before us showed that defendant Cagle delivered the fatal stab wounds. Another distinguishing feature in the case before us is that the evidence suggests that the crime was motivated in part by prejudice toward homosexuals. The coconspirators continually referred to their plan to rob House as a plan to "roll a fag." The plan to stab House, instigated by Cagle, was carried out when Cagle induced House to perform a homosexual act, thereby placing him in a vulnerable position.

We conclude that the present case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence disproportionate or those in which juries have consistently returned recommendations of life imprisonment. Therefore, the sentence of death recommended by the jury and ordered by the trial court in defendant Cagle's case is not disproportionate.

## VIII.

Defendant Cagle concedes that his remaining assignments of error, enumerated VIII through XVII and set out on pages 100 through 112 in his brief, concern issues that this Court has previously decided contrary to his position. Specifically, defendant Cagle contends that the trial court erred in (a) permitting the prosecutor to use peremptory challenges to excuse qualified jurors based on their lack of enthusiasm about the death penalty, *see State v. Allen,* 323 N.C. 208, 222, 372 S.E.2d 855, 863 (1988), *sentence vacated on other grounds,* 494 U.S. 1021, 108 L. Ed. 2d 601 (1990); (b) failing to define "preponderance of the evidence" in relation to defendant's burden to prove mitigating circumstances, *see Walton v. Arizona,* 497 U.S. 639, 650-51, 111 L. Ed. 2d 511, 526-27 (1990); *State v. Payne,* 337 N.C. 505, 532-33, 448 S.E.2d 93, 108-09 (1994), *cert. denied,* — U.S. —, 131 L. Ed. 2d 292 (1995); (c) instructing the jury that defendant bore the burden of proving mitigating circumstances to the satisfaction of the jury, *see State v. Payne,* 337 N.C. at 532-33, 448 S.E.2d at 108-09; (d) instructing the jury on Issue Three of the "Issues and Recommendation as to Punishment" form, concerning the weighing of the mitigating and aggravating circumstances, *see State v. Keel,* 337 N.C. 469, 493-94, 447 S.E.2d 748, 761-62 (1994), *cert. denied,* — U.S. —, 131 L. Ed. 2d 147 (1995); (e) imposing the North Carolina death penalty statute, which defendant contends is unconstitutional, *see State v. Roper,* 328 N.C. 337, 370, 402 S.E.2d 600, 619, *cert. denied,* 502 U.S.

902, 116 L. Ed. 2d 232 (1991); (f) instructing the jury on Issue Four of the "Issues and Recommendation as to Punishment" form, concerning whether the jury was satisfied that the aggravating circumstance found was sufficiently substantial to call for imposition of the death penalty, *see State v. McDougall*, 308 N.C. 1, 26, 301 S.E.2d 308, 323-24, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983); (g) instructing the jury on the burden of proof applicable to mitigating circumstances, *see State v. Payne*, 337 N.C. at 532-33, 448 S.E.2d at 108-09; (h) using the word "may" in the jury instructions on Issues Three and Four of the "Issues and Recommendation as to Punishment" form, *see State v. Gregory*, 340 N.C. 365, 417-19, 459 S.E.2d 638, 668-69 (1995), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 478 (1996); (i) submitting the aggravating circumstance specified in N.C.G.S. § 15A-2000(e)(5), *see State v. Davis*, 340 N.C. 1, 27, 455 S.E.2d 627, 640-41, *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 83 (1995); and (j) refusing to instruct the jury that a sentence of life imprisonment would be imposed if the jury was unable to reach a unanimous agreement on the proper sentence, *see State v. Young*, 312 N.C. at 685, 325 S.E.2d at 191. Defendant raises these issues to provide this Court an opportunity to reexamine its prior holdings and to preserve the issues for any future review. We have carefully considered defendant's arguments on these issues. We find no compelling reason to depart from our prior holdings, and we are not persuaded that prejudicial error occurred so as to warrant a new trial. However, the issues are preserved for any necessary future review.

## ISSUES RAISED BY DEFENDANT SCOTT

[8] Defendant Scott argues two issues to this Court. First, Scott contends that the trial court erred in allowing evidence of Cagle's killing of the cat and in denying Scott's motion for a severance and a mistrial based on that evidence. We disagree.

We have already held that the evidence about Cagle's killing of the cat was properly admitted against defendant Cagle. The court instructed the jury not to consider this evidence in the State's case against defendant Scott. Citing *Bruton v. United States*, 391 U.S. 123, 20 L. Ed. 2d 476 (1968), Scott argues that the court's limiting instruction was not valid to correct the damage caused by the evidence of the cat killing. However, *Bruton* is distinguishable because the evidence admitted in *Bruton* was a nontestifying codefendant's statement; because the defendant could not cross-examine the codefendant about the statement, the defendant's Confrontation Clause

rights were violated. In the case before us, the evidence in question was not an out-of-court statement by Cagle, but was Jones' trial testimony describing the cat killing and a police investigator's trial testimony about physical evidence related to the cat killing. Scott was given an opportunity to cross-examine both witnesses at trial. Therefore, his Confrontation Clause rights were not violated by admission of the evidence. Thus, the remaining question before us is whether the trial court erred in denying defendant Scott's motion for a severance and a mistrial in light of the evidence about the cat killing that was admitted against Cagle.

> The decision to grant or deny a mistrial rests within the sound discretion of the trial court. A trial court should grant a mistrial "only when there are improprieties in the trial so serious that they substantially and irreparably prejudice the defendant's case and make it impossible for the defendant to receive a fair and impartial verdict."

*State v. Marlow*, 334 N.C. 273, 287, 432 S.E.2d 275, 283 (1993) (citation omitted) (quoting *State v. Laws*, 325 N.C. 81, 105, 381, S.E.2d 609, 623 (1989), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990)).

[9] N.C.G.S. § 15A-927 provides that the court must grant a severance

> [i]f during trial, upon motion of the defendant . . . , it is found necessary to achieve a fair determination of the defendant's guilt or innocence of each offense. The court must consider whether, in view of the number of offenses charged and the complexity of the evidence to be offered, the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense.

N.C.G.S. § 15A-927(b)(2) (1988). We review the trial court's decision of whether to grant a severance under the abuse-of-discretion standard. *State v. Barnes*, 345 N.C. 184, 219-20, 481 S.E.2d 44, 63 (1997). As this Court stated in *State v. Barnes*:

> There is a strong policy in North Carolina favoring the consolidation of the cases of multiple defendants at trial when they may be held accountable for the same criminal conduct. Severance is not appropriate merely because the evidence against one codefendant differs from the evidence against another. The differences in evidence from one codefendant to another ordinarily must result in a conflict in the defendants' respective positions at trial of such nature that, in viewing the

totality of the evidence in the case, the defendants were denied a fair trial. However, substantial evidence of the defendants' guilt may override any harm resulting from the contradictory evidence offered by them individually.

*Id.* at 220, 481 S.E.2d at 63-64 (citations omitted).

Defendant Scott argues that the evidence about Cagle's killing of the cat denied Scott a fair trial because it was probative only of Cagle's intent and should not have been allowed to suggest anything about Scott's intent when there was no other evidence presented about Scott's intent. However, Scott was convicted of first-degree murder only under the felony murder rule. Felony murder includes any killing committed in the perpetration or attempted perpetration of a robbery. N.C.G.S. § 14-17 (Supp. 1996). "Felony murder, by its definition, does not require 'intent to kill' as an element that must be satisfied for a conviction." *State v. Richardson*, 341 N.C. 658, 670, 462 S.E.2d 492, 500 (1995). There was substantial evidence of defendant Scott's guilt of felony murder. Therefore, intent to kill was not an element of Scott's felony murder conviction, and he could not have been prejudiced by any evidence related to his intent. The introduction of the evidence against defendant Cagle about Cagle killing the cat could not have denied defendant Scott a fair trial, and the trial court properly denied Scott's motion for a severance and a mistrial. This assignment of error is overruled.

[10] In his final issue, defendant Scott assigns error to two sections of the prosecutor's closing argument to the jury. As we have often stated:

Trial counsel are allowed wide latitude in jury arguments. Counsel are permitted to argue the facts based on evidence which has been presented as well as reasonable inferences which can be drawn therefrom. Control of closing arguments is in the discretion of the trial court. Additionally, as this Court has previously pointed out, "for an inappropriate prosecutorial comment to justify a new trial, it 'must be sufficiently grave that it is prejudicial error.' " [*State v.*] *Soyars*, 332 N.C. [47,] 60, 418 S.E.2d [480,] 487-88 [(1992)] (quoting *State v. Britt*, 291 N.C. 528, 537, 231 S.E.2d 644, 651 (1977)). In order to reach the level of "prejudicial error" in this regard, it now is well established that the prosecutor's comments must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181, 91 L. Ed. 2d

144, 157 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637[, 643], 40 L. Ed. 2d 431[, 437] (1974)).

*State v. Green*, 336 N.C. at 186, 443 S.E.2d at 39-40 (citations omitted).

First, Scott contends that the prosecutor argued medical facts not in evidence. Jones testified that during the assault on House, Scott punched House in the head and may have hit him with a bowling ball. Scott's attorney pointed out to the jury that House was not bruised and argued that, contrary to Jones' story, Scott did not hit House or participate in the incident. The prosecutor rebutted this argument when he said to the jury:

> From your personal experience and your common sense, you know it takes time for a bruise to develop. You know it takes time for a contusion to develop. . . . You know that Dennis Craig House died within minutes after this assault on him, within minutes. . . . Now it doesn't take the chief medical examiner of the State of North Carolina, it doesn't take a medical doctor, it doesn't take anybody other than a person who has got a lick of sense to know that when you are dead, your bodily processes stop.

When Scott's attorney objected, the court ruled that "[c]ounsel is entitled to argue the evidence, reasonable inferences to be drawn from the evidence. It is for the members of the jury to determine what the evidence and the case does, in fact, show. The objection is overruled, exception noted for the record."

After reviewing the transcript, we conclude that even if it is not reasonable to infer that bruising stops when someone dies, defendant was not prejudiced by the prosecutor's argument. Jones testified, and the jury found, that Scott was a coconspirator in the plan to rob House. Scott carried the knife from the motel room, and he told Jones the plan to stab House while House performed oral sex on Cagle. The jury was instructed on the theory of acting in concert.

> Under the doctrine of acting in concert when two or more persons act together in pursuance of a common plan or purpose, each is guilty of any crime committed by any other in pursuance of the common plan or purpose. Under the felony murder rule a homicide committed in the perpetration of one of the statutorily specified felonies is first degree murder. N.C.G.S. 14-[17]. . . . "[W]hen two people act in concert to commit a robbery, each person is responsible not only for that crime, but for a murder com-

mitted during the course of the robbery." *State v. Reese*, 319 N.C. 110, 141, 353 S.E.2d 352, 370 (1987)[, *overruled on other grounds by State v. Barnes*, 345 N.C. 184, 481 S.E.2d 44 (1997)].

*State v. Thomas*, 325 N.C. 583, 595, 386 S.E.2d 555, 561-62 (1989). Thus, under the theory of acting in concert, it is irrelevant whether Scott committed any positive act in the assault on House. Therefore, we conclude that the prosecutor's comments about the bruising did not so infect the trial with unfairness as to make the resulting conviction a denial of due process.

[11] Defendant Scott also contends that although the court had given a limiting instruction that the evidence of the cat killing should be considered as evidence only of defendant Cagle's intent, the prosecutor improperly argued that the killing of the cat should be considered as evidence against Scott. The challenged argument follows:

> What is the significance of the dead cat with respect to Jones and Scott? . . . The death of the cat occurred, uncontradicted, in front of both of them after Mr. Scott had made the statement to Mr. Jones, "Here's the plan, while Ricky's getting oral sex, you're supposed to stab him." That is what was said before the death of the cat.

> Now, Mr. Scott is there and sees Mr. Cagle do this to the cat. There has been a lot of talk about the joking nature this evening, the partying nature of this event.

> Well, folks, whatever the perception of that nature, that joking, that partying, it got deadly serious when Ricky Cagle killed that cat in front of these two people. It matters not that Ricky said, "I don't like cats." So what? If you don't like the cat, throw him out the door if you are going to party and get on with it. Have a nice time. Do some tattoos. . . .

> He doesn't like cats and he also intended to kill Dennis Craig House that night. And Michael Scott stood right there and watched him. And Ricky—excuse me, Ryan Jones stood right there and watched him. And both of them knew at that point, "Whoa, this is some serious stuff."

> . . . .

> The statements have been made. The cat, which had nothing to do, nothing to do, with that conspiracy except to show you the intent of the party who did the act of killing the cat and to tele-

graph to his confederates, his accomplices, "Okay boys, this is serious. Party time is over. The rolling party is over, and now the rolling is gonna start."

As we held above, intent to kill was not an element of Scott's felony murder conviction, and he could not have been prejudiced by any evidence of his intent. Following the same reasoning, we conclude that any implication that the prosecutor made in his argument about Scott's intent did not so infect the trial with unfairness as to make the resulting conviction a denial of due process. This assignment of error is overruled.

Having considered and rejected all of the assignments of error presented by defendant Cagle and defendant Scott, we hold that both defendants received a fair trial and sentencing proceeding, free from prejudicial error. Therefore, the sentences entered against both defendants must be and are left undisturbed.

NO ERROR.