PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

RICHARD EUGENE CAGLE,
        *Petitioner-Appellant,*

v.

GERALD J. BRANKER, Warden,
Central Prison, Raleigh, North
Carolina; THEODIS BECK, Secretary,
North Carolina Department of
Corrections,
        *Respondents-Appellees.*

No. 07-6

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Malcolm J. Howard, Senior District Judge.
(5:02-hc-00666-H)

Argued: January 29, 2008

Decided: March 17, 2008

Before WILKINSON, MICHAEL, and KING, Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion,
in which Judge Michael and Judge King joined.

---

## COUNSEL

**ARGUED:** Milton Gordon Widenhouse, Jr., RUDOLF, WIDEN-
HOUSE & FIALKO, Chapel Hill, North Carolina; Thomas Franklin
Loflin, III, LOFLIN & LOFLIN, Durham, North Carolina, for Appel-

lant. Steven Mark Arbogast, NORTH CAROLINA DEPARTMENT
OF JUSTICE, Raleigh, North Carolina, for Appellees. **ON BRIEF:**
Roy Cooper, Attorney General of North Carolina, Raleigh, North Car-
olina, for Appellees.

---

**OPINION**

WILKINSON, Circuit Judge:

Richard Cagle, a North Carolina prisoner convicted of murder and
sentenced to death, appeals the district court's dismissal of his peti-
tion for a writ of habeas corpus. He claims that the absence of a key
witness, ineffective assistance of counsel as to a motion to sever, inef-
fective assistance of counsel as to mitigation, and the lack of a jury
instruction as to voluntary intoxication deprived him of a fair trial and
sentence. Having reviewed his claims with care, we find them to be
without merit and affirm the district court.

I.

Richard Cagle was a drifter who went from town to town under
various names and with various women, dancing in bars and trying
to stay a step ahead of the law enforcement agencies looking for him.
On the evening of November 4, 1993, he was living with his girl-
friend, Jamie Kass, at a motel in Fayetteville, North Carolina when
he decided to visit a gay nightclub across the street. He there encoun-
tered the victim, a man named Dennis House. Cagle and House were
playing pool when Kass joined them later in the evening, bringing
with her two magazine salesmen she had befriended, Michael Scott
and Ryan Jones, who worked together and were also staying at the
motel.

The group eventually returned to the motel. House drove. The other
four walked, and on the way, Cagle told them that House had about
$4,000 and a pound of marijuana in his home, and that they should
rob him — which the four of them termed "rolling a fag." Back at the
motel, the group drank and smoked marijuana. Whenever House left
the room, the conversation about "rolling a fag" picked up again.

Eventually, the four men climbed into House's truck to continue the party at his home, a trailer some distance away, while Kass stayed behind. House and Cagle got in the truck first. Scott and Jones lingered to get a knife from Kass.

The drinking, marijuana smoking, and plotting continued in House's trailer. At some point when House was in another room, Scott pulled Jones aside to tell him the plan: that Cagle would seduce House into giving him oral sex, and that Jones would stab House in the back while he was distracted. Cagle then picked up House's cat and slammed its head against the wall and against a fish tank, splitting open its skull and tossing its body behind the couch. Jones hid in the bathroom. When House started performing oral sex on Cagle, Jones emerged and stabbed House in the back.

Thus far, there is rough agreement on the facts between the parties. But here the account splits, and we proceed with the facts as accepted by the jury and affirmed by the Supreme Court of North Carolina, "based substantially on the testimony of Ryan Christopher Jones." *State v. Cagle*, 488 S.E.2d 535, 540 (N.C. 1997).

After stabbing House that first time, Jones dropped the knife, and Cagle picked it up. House said, "Why are you guys doing this? I'll give you anything." Cagle then stabbed him in the chest three or four times. Scott started punching him in the head and tried to hit him with a bowling ball. Cagle dropped the knife and hit him with something that looked like a fireplace poker or pool cue. The three men then ran to the back room, where Cagle said, "Go finish him, go kill him." But instead, they left through the front door, with Jones grabbing the knife on the way out and Cagle taking a camera.

House ran to his neighbor Roger's house, where he said "Roger, they are trying to kill me" and died, the fatal wound coming from a stab in the chest. Cagle, Scott, and Jones planned an alibi and, reaching a house down the street, tried to get the woman there to let them in to call a cab. She refused and called the police. A sheriff came and, seeing the blood on Cagle's pants, arrested the three.

During the police interviews that followed, Jones stated from the first that he had stabbed House in the back once, but that Cagle had

struck the fatal blows to House's chest. Cagle denied ever picking up the knife and claimed Jones was the killer. And Scott's story shifted. At first, he told the officers that Cagle alone had used the knife. When one of the officers pointed out the inconsistency between his account and Jones's, Scott amended his story, stating that Jones had struck the first blow with the knife and Cagle the rest.

Ultimately, Jones accepted a plea agreement in return for his testimony against Scott and Cagle, who were tried jointly for murder, robbery, and conspiracy at the Cumberland County Superior Court in May and June 1995. In defense, they tried to show that it was Jones, not them, who had inflicted the fatal wounds. Neither testified, but they called a number of witnesses to testify to Jones's dishonesty, and one, a cellmate of Jones's, who testified that Jones had bragged about killing House by stabbing him repeatedly. Nonetheless, the jury convicted Cagle of first-degree murder on the basis of premeditation and deliberation, and Cagle and Scott both of first-degree felony murder, robbery with a dangerous weapon, and conspiracy to commit robbery with a dangerous weapon.

A capital sentencing proceeding followed in June 1995, *see* N.C. Gen. Stat. § 15A-2000 (2007), with the same jury and judge, and the two defendants again tried together. Neither testified. Cagle's attorneys presented mitigation evidence showing that Cagle had been physically and sexually abused by his mother's male friends as a child; that he came from a family with a history of alcohol abuse and violence; that he committed the crime under the influence of a mental or emotional disturbance; and that he was in the borderline range of mental retardation. The jury accepted all of these mitigating factors and made findings accordingly. But it nonetheless recommended, and the judge imposed, a sentence of life imprisonment for Scott, and death for Cagle.

On direct appeal, the North Carolina Supreme Court affirmed the convictions and sentences, *State v. Cagle*, 488 S.E.2d 535 (N.C. 1997), and the United States Supreme Court denied certiorari, *Cagle v. North Carolina*, 522 U.S. 1032 (1997). Seeking state post-conviction relief, Cagle filed a Motion for Appropriate Relief ("MAR") in Cumberland County Superior Court. After holding an evidentiary hearing, the court denied all of Cagle's claims, and the

North Carolina Supreme Court affirmed. *State v. Cagle*, 568 S.E.2d 616 (N.C. 2002). Turning to federal post-conviction relief, Cagle filed a habeas petition under 28 U.S.C. § 2254 in the United States District Court for the Eastern District of North Carolina, which the district court dismissed. Cagle appealed.

## II.

Four issues remain in contention in this case. First, Cagle claims that newly available evidence — a change of heart and change of story from his co-defendant, Michael Scott — undermines the jury's capital sentence and entitles him to a new sentencing proceeding. Second, Cagle claims he received ineffective assistance of counsel during both the guilt and penalty phases of trial because his attorneys failed to sever his case from Scott's, thus discouraging Scott from testifying in Cagle's favor. Third, Cagle again claims ineffective assistance, this time because his attorneys' approach to mitigation at sentencing focused exclusively on his troubled history, and not at all on his redeeming traits of character. Fourth, Cagle claims he was entitled to a jury instruction as to voluntary intoxication during the guilt phase of trial.

The state MAR court considered and rejected the first three claims after an evidentiary hearing at which it heard testimony from Cagle's attorneys, Scott's attorneys, and Scott himself, among others. The state trial court considered and rejected the fourth claim at a charge conference during trial. The North Carolina Supreme Court affirmed its MAR and trial courts on all four claims. Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), we uphold those courts' rulings unless they are "based on an unreasonable determination of the facts" or "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d) (2000); we also presume the courts' factual findings to be correct unless the habeas petitioner proves otherwise "by clear and convincing evidence," *id.* at § 2254(e)(1)**.** We review the district court, which also rejected all four claims, *de novo. See Allen v. Lee*, 366 F.3d 319, 323 (4th Cir. 2004) (en banc).

A.

We first address the claim that Michael Scott's changed story enti-tles Cagle to resentencing. Just after the sentencing jury returned with its recommendations, Cagle's co-defendant, Michael Scott, said in allocution that neither he nor Cagle had ever stabbed Dennis House. At the MAR hearing, Scott repeated that claim and said that Ryan Jones, the co-conspirator turned state's witness, was the real killer. True, Scott testified, he had initially told investigators that Cagle was the killer. But that was because he and Jones, friends from their work together as magazine salesmen, had agreed when they fled the scene to lay the blame on Cagle if they were caught. He had decided to come clean after reading the Gospel of John while in jail awaiting trial. He had told his lawyers then that he wanted to testify on Cagle's behalf, but they had discouraged him from doing so. Now, he testi-fied, he was finally telling the truth.

Characterizing this testimony as evidence "unavailable to the defendant at the time of trial" with a "direct and material bearing upon the defendant's eligibility for the death penalty or the defendant's guilt or innocence," N.C. Gen. Stat. § 15A-1415(c) (2007), Cagle moved in the state MAR court for resentencing and a new trial (although he limits his claim on habeas to resentencing). The MAR court refused. A petitioner must meet seven requirements to re-open proceedings based on new evidence, the court reasoned, and Scott's testimony failed four of them: It was not "newly discovered" or newly available, more than a means by which to "contradict a former wit-ness or to impeach or discredit him," "probably true," or "of such a nature as to show that on another trial a different result will probably be reached." *State v. Bishop*, 488 S.E.2d 769, 790 (N.C. 1997). As to the first, the court did not regard a co-defendant's favorable testi-mony, after staying silent throughout trial and sentencing, to be newly discovered or available. As to the second, the court pointed out that the testimony served to do no more than contradict, impeach, and dis-credit Jones. And as to the third and fourth, the court found that Scott was "an opportunistic liar," with "nothing to lose" by exonerating Cagle and not much prospect of moving a jury on retrial or resentenc-ing. JA2310-11.

Cagle makes three arguments against this ruling now. First, he claims that the MAR court abandoned the applicable state statute,

which required only "direct and material" evidence "unavailable to the defendant at the time of trial," in favor of a stricter seven-factor test drawn from North Carolina case law. *Compare* N.C. Gen. Stat. § 15A-1415(c) *with Bishop*, 488 S.E.2d at 790. But this argument obviously transgresses the principle "that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Cagle tries to rescue the argument by claiming a federal due process right to have state courts fairly apply the criminal law laid down by their own legislatures. But this principle has no limit and the MAR court's interpretation of state statutes and case law presents no federal question.

Second, Cagle argues that the MAR court's conclusions about Scott's testimony were "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2) (2000). In particular, Cagle assails the MAR court's core finding that Scott was an "opportunistic liar" whose testimony would not sway a reasonable jury. But for a federal habeas court to overturn a state court's credibility judgments, the state court's error must be stark and clear. *See id.* § 2254(e)(1) (protecting state courts' factual judgments unless disproved in federal court by "clear and convincing evidence"). Indeed, "federal habeas courts [have] no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). Here, Scott by all accounts told three different stories of Cagle's role in Dennis House's murder: one in which Cagle alone used the knife, a second in which Cagle and Jones both used it, and a third in which Jones alone used it. Obviously no fewer than two of his stories were unworthy of belief. Under such circumstances, the state court was entitled to its skepticism about Scott's testimony, and we have no warrant to intrude.

Finally, Cagle points to a series of cases in which the Supreme Court, acting on the principle that "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense," *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quotation omitted), overturned the verdicts or sentences of state trial courts for excluding the testimony of defendants' key witnesses. *See Holmes*, 547 U.S. 319; *Green v. Georgia*, 442 U.S. 95 (1979) (per

curiam); *Chambers v. Mississippi*, 410 U.S. 284 (1973); *Washington v. Texas*, 388 U.S. 14 (1967). In this vein, Cagle emphasizes how overwhelmingly the state's case depended upon Ryan Jones, and how in particular the jury's decision to sentence Cagle to death hinged on believing Jones's claim that Cagle inflicted the fatal wounds. Scott's testimony would have given the jury a firm basis — its only firm basis, from the only other eyewitness besides Cagle himself — on which to question that belief, Cagle argues. In short, the testimony was so important that denying him a new sentencing proceeding in which to present it amounted to denying him his "clearly established" constitutional right to mount a defense. 28 U.S.C. § 2254(d)(1) (2000).

In the cases Cagle cites, the defendant's right to present a complete defense was abridged by evidence rules that "infringe[d] upon a weighty interest of the accused and [were] arbitrary or disproportionate to the purposes they [were] designed to serve." *Holmes*, 547 U.S. at 324 (quotation omitted). Neither factor is present here.

First, the state MAR court's decision not to re-open sentencing for the sake of Scott's testimony did not infringe upon a weighty interest that is clearly established under federal law. It is one thing to exclude a defense witness's testimony during conviction or sentencing proceedings (the issue in *Holmes*, *Green*, *Chambers*, and *Washington*), and quite another to decline to re-open conviction or sentencing proceedings so that a former co-defendant might testify in them. Once conviction and sentencing is complete, the presumption of innocence has passed. *See Herrera v. Collins*, 506 U.S. 390, 399 (1993). The presumption of finality on the other hand is strong. *See Wainwright v. Sykes*, 433 U.S. 72, 90 (1977). And courts — not just North Carolina's courts, but federal courts as well — are generally loathe to re-open proceedings for post-sentencing testimony from a co-defendant, regarding such testimony with great suspicion. *See, e.g.*, *United States v. Freeman*, 77 F.3d 812, 817-18 (5th Cir. 1996); *United States v. Dale*, 991 F.2d 819, 838-39 (D.C. Cir. 1993) (per curiam); *United States v. Reyes-Alvarado*, 963 F.2d 1184, 1188 (9th Cir. 1992);*United States v. Jacobs*, 475 F.2d 270, 286 n.33 (2d Cir. 1973); *see also United States v. Bales*, 813 F.2d 1289, 1295 (4th Cir. 1987).

Second, the state MAR court's decision was not arbitrary or disproportionate. The MAR court found Scott to be an "opportunistic liar"

whom no reasonable jury would believe — a view, as we have already explained, to which the court was very much entitled. In addition, the MAR court held that Scott's potential testimony was not newly discovered because Cagle's counsel were aware of it at trial (Scott had simply invoked his Fifth Amendment privilege not to testify at that time). And the court regarded Scott's testimony as merely duplicating other testimony that was offered at trial and that also tended to contradict Jones. By contrast, *Holmes*, *Green*, *Chambers*, and *Washington* all featured penetrating evidence of actual innocence excluded "under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote." *Holmes*, 547 U.S. at 326; *see also Green*, 442 U.S. at 97 ("The excluded testimony was highly relevant . . . and substantial reasons existed to assume its reliability."); *Chambers*, 410 U.S. at 302 (same); *Washington*, 388 U.S. at 23 (same). The MAR court's decision not to re-open Cagle's sentencing was reasonable, and nothing about it involved deficient fact-finding or a violation of clearly established federal law. *See* 28 U.S.C. §§ 2254(d), (e)(1).

B.

Scott's change of story also sets in motion the first of Cagle's two ineffective assistance of counsel claims: the claim that Cagle's attorneys should have found a way to sever his trial from Scott's so as to smooth the way for Scott to testify in Cagle's favor. Cagle must show both deficient performance and a "reasonable probability" of prejudice to prevail. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).

This claim has evolved somewhat over the course of postconviction proceedings. Initially, Cagle's chief argument was that his attorneys did not move to sever prior to the guilt phase of trial. But there was a fatal problem with this argument: Cagle's attorneys *did* argue — "adamantly and vigorously," in the state MAR court's words, JA2343 — that Cagle and Scott should be tried separately; counsel simply did so in the course of opposing the state's joinder motion rather than through their own motion to sever. Cagle now complains that they failed to adequately specify the basis for their opposition by telling the judge what Scott would say on the stand. But a look at the transcript reveals that Cagle's attorney told the judge

exactly what the issue was: "Initially, Mr. Scott . . . made a statement to law enforcement officers the morning after he was arrested, and that statement did not benefit Mr. Cagle. However, within the past several months . . . [Scott] corrected the false statement he made to the police before with respect to, with regard to who actually committed the crime against Mr. House. Mr. Scott is a crucial witness so far as we're concerned." With leisure we might find (and Cagle's attorneys themselves might find) better ways to express the point, but, as the state MAR court and federal district court both held, nothing in this conduct was tenably deficient.

Cagle has, on appeal, changed the emphasis of his argument. His chief point now is that his attorneys did not effectively move to sever when a fresh opportunity presented itself after the guilt phase of trial had ended but before the penalty phase had begun. True, he acknowledges, counsel did technically file a motion to sever at that time. But their motion never mentioned Scott's potential testimony (instead concerning itself wholly with a rather technical *Bruton* claim). And since the judge who presided over trial and sentencing was not the one who had presided over the pretrial joinder motion, the person deciding the motion to sever at sentencing was never informed that the real issue at stake was Scott's testimony.

Not all motions that request the same action — in this case, severance — are equal; the reasons given matter. But without deciding whether counsel was deficient with respect to this motion, it is clear to us — as it was to the state MAR and federal district courts — that Cagle cannot demonstrate prejudice. First, Scott lacked credibility, as the state MAR court repeatedly emphasized. Second, calling him to the stand to testify to Cagle's innocence would also give the prosecution a chance to introduce the initial statements Scott had given to officers at the time of the crime — thus corroborating Jones's story and Cagle's guilt, and quite possibly doing much more harm than good. Third, it is not clear to us that Scott would have testified on Cagle's behalf even if the sentencing court had granted the motion to sever. His attorney had stated during the earlier joinder discussion that "[i]t's up to him when he's called to the stand whether he wants to testify or not, and I'm not about to say whether he will or won't. And it doesn't matter whether it's at a joint trial or a separate trial . . . ." One of Cagle's attorneys had said (in his testimony before the

MAR court) that he had "talked with . . . counsel for Mr. Scott on several occasions, and he had told me he would not permit Scott to testify on behalf of Ricky Cagle." (Scott's attorney also testified before the MAR court and said the opposite, but the court credited the view of Cagle's attorney.) With so many problems and contingencies, there is not a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694.

## C.

Cagle's second ineffective assistance claim turns on his attorneys' approach to mitigation during the penalty phase of trial. Counsel had available to them three family members, Cagle's mother, stepfather, and daughter, who would have testified to Cagle's volunteer work, accepting attitude to people of different races and sexual orientations, kindness toward animals, and close and loving relationship to his daughter — good character traits essential, Cagle argues, to balancing out the jury's otherwise totally negative picture of him. But rather than calling his family members to the stand, counsel focused exclusively on demonstrating Cagle's cognitive and emotional problems and the hardships in his life. In the capital context, Cagle argues, this one-sidedness was constitutionally deficient and prejudicial.

There can be no question that Cagle's counsel made an informed, strategic decision not to call Cagle's family members and not to try to demonstrate Cagle's good character. As the MAR hearing showed, Cagle's attorneys hired a mitigation expert to help research Cagle's background and advise them on strategy. The expert and attorneys decided after careful investigation that calling Cagle's mother, stepfather, and daughter would only open the door to devastating rebuttal evidence. As the MAR court found, "the State had overwhelming evidence to contradict the testimony of defendant's mother who described the defendant as a kind loving family man who 'just wanted to help people.'" JA2330. And as to Cagle's daughter, the evidence would demonstrate that Cagle showed her only "the most minimal attention until he [was] in the jail house awaiting trial for murder." *Id.* Cagle's attorneys thus decided to present evidence of Cagle's turbulent childhood and low functioning through two impartial experts. This is exactly the kind of "strategic choice[ ] made after thorough

investigation" that, according to *Strickland*, is "virtually unchallengeable." 466 U.S. at 690.

Cagle argues that, however insulated attorneys' strategic decisions ordinarily may be, the failure to present available evidence of good character in a capital case is beyond the pale. He points us to a trio of recent capital cases in which the Supreme Court held counsel to be ineffective for failing to present available mitigating evidence: *Rompilla v. Beard*, 545 U.S. 374 (2005), *Wiggins v. Smith*, 539 U.S. 510 (2003), and *Williams v. Taylor*, 529 U.S. 362 (2000). He stresses that under *Wiggins*, prejudice requires only "a reasonable probability that at least one juror would have struck a different balance." 539 U.S. at 537. And he argues that counsel's justification for not presenting evidence of Cagle's good character traits — the risk of opening the door to further damaging evidence — was unreasonable where the jury had already heard such ample evidence of Cagle's bad character and convicted him of a terrible murder.

The problem is, the three cases on which Cagle relies to displace our ordinary *Strickland* deference to counsel's strategic choices, *Rompilla*, *Wiggins*, and *Williams*, are not on point. All three concern what *Rompilla* calls "norms of adequate investigation in preparing for the sentencing phase of a capital trial," 545 U.S. at 380, and in all three, counsel's failure was a breach of the duty to investigate potential mitigating evidence before settling on a mitigation strategy, *see Rompilla*, 545 U.S. at 383; *Wiggins*, 539 U.S. at 524-27; *Williams*, 529 U.S. at 395. Here, Cagle's attorneys *did* thoroughly investigate potential mitigating evidence, and Cagle never says otherwise. His complaint is with how they decided to use the evidence they found. That, of course, is a paradigmatically strategic decision. And it was not an unreasonable decision in either the MAR court's judgment or in ours.

### D.

Finally, on the strength of trial evidence showing that he had been drinking and smoking marijuana before the crime, Cagle claims that he was entitled to a jury instruction as to voluntary intoxication during the guilt phase of trial. The trial court refused (and the state supreme court affirmed) because "the evidence failed to show that at the time of the killing, defendant Cagle's mind and reason were so

completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill" — the standard under North Carolina case law. *State v. Cagle*, 488 S.E.2d 535, 543 (N.C. 1997); *see also State v. Medley*, 243 S.E.2d 374, 377 (1978). Cagle does not claim the facts showed him to have been *that* intoxicated. Rather, he argues that the North Carolina standard is so exacting as to violate his due process rights — for getting the instruction requires proving a higher level of drunkenness than a reasonable juror would need to reject premeditation and deliberation, thus effectively shifting the burden of proof as to *mens rea* from the state to the defendant.

What makes this argument a non-starter is a case Cagle never addresses, although it speaks directly to the constitutional dimensions of a claim of voluntary intoxication: *Montana v. Egelhoff*, 518 U.S. 37 (1996). The plurality in *Egelhoff* held that there is no right under the Due Process Clause to present evidence of voluntary intoxication in order to rebut *mens rea*. *Id.* at 43, 56. Justice Ginsburg, concurring, agreed, so long as a state's voluntary intoxication rule is in substance a judgment about culpability — a judgment, that is, about "the circumstances under which individuals may be held criminally responsible for their actions" of the kind states are traditionally entitled to make. *Id.* at 57.

Here, North Carolina has obviously determined that before intoxication can reduce a defendant's responsibility for his actions, the defendant must be very intoxicated. That judgment is well within North Carolina's traditional constitutional authority, and is the state's to make.

III.

For the foregoing reasons, the judgment of the district court dismissing Cagle's habeas petition is

*AFFIRMED.*