UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 08-7813

MATTHEW BRIAN BOSEMAN, a/k/a Brian Boseman,

Petitioner - Appellee,

v.

RICHARD E. BAZZLE, Warden, Perry Correctional Institution,

Respondent - Appellant.

Appeal from the United States District Court for the District of South Carolina, at Rock Hill.  David C. Norton, Chief District Judge.  (0:07-cv-01344-DCN)

Argued:  December 3, 2009                Decided:  February 9, 2010

Before WILKINSON, SHEDD, and AGEE, Circuit Judges.

Reversed and remanded by unpublished opinion.  Judge Agee wrote the opinion, in which Judge Wilkinson and Judge Shedd joined.

**ARGUED:** William Edgar Salter, III, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Appellant.  Neal Lawrence Walters, UNIVERSITY OF VIRGINIA SCHOOL OF LAW, Charlottesville, Virginia, for Appellee.  **ON BRIEF:** Henry D. McMaster, Attorney General, John W. McIntosh, Chief Deputy Attorney General, Donald J. Zelenka, Assistant Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina for Appellant.  Christopher Norfleet, Third Year Law Student, Jamila Willis, Third Year Law Student, UNIVERSITY OF VIRGINIA SCHOOL OF LAW, Charlottesville, Virginia, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

AGEE, Circuit Judge:

Matthew Brian Boseman is a state inmate in the custody of the South Carolina Department of Corrections, serving a life sentence for murder and armed robbery. He filed this 28 U.S.C. § 2254 petition for a writ of habeas corpus in the District of South Carolina against Richard E. Bazzle, Warden of the Perry Correctional Institute ("the Warden"). The district court conditionally granted Boseman's habeas petition, holding that the state post-conviction relief court ("the PCR court") unreasonably applied the Supreme Court's decision in Strickland v. Washington, 466 U.S. 668 (1984), and unreasonably interpreted the facts surrounding counsel's failure to present evidence of an alibi. The Warden appeals the issuance of the writ to Boseman. For the reasons that follow, we reverse and remand the judgment of the district court.

I.

The district court detailed the salient facts supporting Boseman's conviction:

> Petitioner was indicted during the February 1996 term
> of the Court of General Sessions on charges of murder
> and armed robbery. Petitioner's first trial began on
> November 20, 1996, but ended in a mistrial due to
> juror misconduct. Petitioner's second trial began on
> April 7, 1997, during which he was represented by
> attorneys Douglas Strickler and Cynthia Durham. The
> jury found petitioner guilty on both charges, and the
> trial judge imposed a sentence of life imprisonment

for the murder conviction and a consecutive term of twenty years imprisonment for the armed robbery conviction.

Petitioner was convicted of robbing and murdering Oscar Griffis, a Domino's Pizza delivery driver. The evidence presented in the prosecution's case-in-chief established an uncontroverted timeline showing that the relevant events occurred between 9:15pm and 10:00pm on October 31, 1995. Domino's Pizza received a telephone call between 9:15pm and 9:17pm, requesting a delivery to a residence at 3701 Trotter Road in Columbia, South Carolina. The caller identified himself as "Albert" and provided a false phone number. Griffis made his first delivery without incident between 9:15pm and 9:30pm. He then apparently proceeded to 3701 Trotter Road, where he was robbed and shot once in the chest. Between 9:30pm and 10:00pm, Griffis arrived at a nearby convenience store (driving himself there) and collapsed on the floor. The clerk and others in the store quickly called 911. The time of Griffis's arrival is evidenced by the store's video surveillance camera, which recorded Griffis arriving at the store shortly after 9:45pm. Brian Goff, a Columbia Police officer, said he was dispatched to the store between 9:30pm and 10:00pm and was the first emergency responder on the scene. EMS arrived at exactly 10:00pm and immediately transported Griffis to the hospital (departing the convenience store for the hospital at 10:04pm). Griffis died three days later. . . .

The Richland County Sheriff's Department's investigation revealed the call to Domino's Pizza came from a house owned by Jesse Shelton, who lived there with his three sons, Jason, Terah, and fifteen-year-old M.S. Based on the phone records, the Sheriff's Department obtained and executed a search warrant on the Shelton home. Investigators found burned remnants of pizza boxes and checks made payable to Domino's Pizza in the backyard. Thereafter, M.S. and petitioner (who is not related to the Sheltons but lived nearby) were arrested and indicted on charges of robbing and murdering Griffis. Before petitioner's trial, M.S. pleaded guilty to both charges as a juvenile in the Richland County Family Court, receiving a six-year sentence with eligibility for early release with good behavior.

4

The state's theory of the case was that petitioner planned and orchestrated the entire event and that M.S. was something of an unknowing accomplice. The state argued that petitioner—and not any of the Sheltons—made the phone call from the Shelton house to Domino's Pizza that night and chose to lure the driver to 3701 Trotter Road because he was familiar with the area. According to the state, after eating dinner at and generally hanging around the Shelton house on the evening of the crime, petitioner recruited M.S. to tag along on a robbery. The two went to the scene of the "ambush" where they crossed paths with a group of trick-or-treaters, none of whom actually saw petitioner but one identified petitioner at trial based on the sound of his voice. The state asserted that M.S. did not know petitioner was carrying a gun. When Griffis arrived at the Trotter Road address, the state argued petitioner and M.S. robbed him, and that petitioner shot Griffis once in the chest. Thereafter, according to the state, petitioner and M.S. returned to the Shelton house where petitioner informed M.S.'s brother Terah that he should watch the 11:00pm news. Petitioner carried checks and pizza boxes around the house, describing the items to others as "loot," and later burned his "loot" in the Sheltons' backyard. The state thus argued that petitioner purposefully set out to rob the Domino's Pizza driver, lured the driver to the scene of the crime using the Sheltons' phone, shot the driver, bragged about his crime at the Shelton house, and disposed of the evidence there. The state conceded there was no physical evidence connecting petitioner to the crime.

Deloris Matthews was working at the convenience center when Griffis came in and collapsed on the floor. As he laid on the floor, Griffis told her that he was shot by two black individuals, who were wearing ski masks, had big eyes, and one of them had "funny," "frizzed up" hair. Griffis also said the perpetrators were "skinnier" or "smaller" than Griffis, who Matthews described as a "burly" man. Griffis was six feet tall and weighed 240 pounds. Matthews also testified at trial that Griffis said one of the perpetrators was five feet, nine inches tall and the other was about six feet tall, although those details were noticeably absent from the statement she gave to police only three hours after Griffis arrived at the

5

store.  Petitioner is six feet, one inches tall,; Terah Shelton was five feet, ten inches tall and weighed 235 pounds; Jason Shelton was five feet, seven inches tall and 140 pounds; and M.S. was about five feet, five inches tall and weighed 140 pounds.

At trial, M.S. was the prosecution's primary witness against petitioner.  He testified that he and his brothers "hung out" with petitioner (known around the neighborhood as "Method Man") almost every day.  According to M.S., between 5:30pm and 7:30pm on the night of the crime, petitioner was at the Shelton house playing games—and M.S.'s father, his two brothers (Terah and Jason), and Jason's girlfriend were in the house as well.  M.S. stayed at the Shelton house until petitioner approached him and told M.S. he was going out on a "lick," which is slang for a robbery.  M.S. recounted that petitioner had left the house sometime after dinner and returned later, at which time he approached M.S. about the robbery.  According to M.S., nobody else heard petitioner make that statement nor was anyone else involved.  Following that conversation, he and petitioner walked from the Shelton residence through a path in the woods until they came to Trotter Road.  M.S. was familiar with the path because he had used it before and knew that the wooded area at the end of the path was dark.  Petitioner and M.S. crouched down at the end of the path overlooking Trotter Road.

M.S. stated that petitioner then told him they were going to rob a pizza delivery driver.  M.S. testified that he did not personally make the phone call nor have any idea what petitioner had done at the house before they left.  M.S. did not keep track of petitioner for the entire time he was at the Shelton house.  While they were waiting in the woods, "some people came trick or treating" down the path.  When members of that group asked who was in the woods, according to M.S., petitioner "stepped out and cocked a gun."  That was when M.S. learned that petitioner was carrying a firearm.  There was a conversation between petitioner and the trick-or-treaters, but M.S. testified he was too far away to hear what was said.

After the trick-or-treaters moved on, Griffis arrived at 3701 Trotter Road.  When he pulled into the driveway, M.S. and petitioner ran over to him, put a gun to his head, shot at him (the bullet hit him in the chest), went through his pockets, stole the checks

6

and pizzas, and took off back through the woods. M.S. heard two gunshots, although only one bullet hit Griffis. Investigators did not locate the other bullet. M.S. said he was wearing his t-shirt tied around his face and that petitioner was wearing a ski mask during the robbery.

M.S. testified the duo then returned to the Shelton house, but his testimony was unclear and inconsistent about the timing of the return. He initially indicated that petitioner returned immediately to the Shelton house, but then stated that petitioner went somewhere else and returned to the house shortly after M.S. did. Once M.S. and petitioner reunited at the Shelton house, M.S. testified that they ate the pizzas and he saw petitioner burn the checks and pizza boxes in the backyard. They also saw M.S.'s brother Terah. M.S. testified that petitioner told Terah to watch the 11:00pm news, but neither M.S. nor petitioner told Terah what had happened. The three watched the news together and then M.S. went to bed.

Boseman v. Bazzle, 2008 U.S. Dist. LEXIS 75255, *3-*11 (C/A/ No. 0:07-CV-01344-DCN) (D.S.C. July 24, 2008) (footnotes and citations to the record omitted). On cross-examination, defense counsel questioned the consistency of M.S.'s statements to police and investigators, as well as drawing attention to the favorable terms of his plea agreement.

Other members of the Shelton family testified in support of portions of M.S.'s narrative and to having seen Boseman at their house at various times the evening of the shooting. In addition, one of the adults chaperoning the group of trick-or-treaters testified that they encountered two "shadowy figures" along the path to Trotter Road, but that he could not identify them by sight. However, the same witness testified that he

7

recognized Boseman's voice when one of the shadowy figures spoke to him. One of the Sheltons' neighbors testified that he was present the day after the incident when Boseman "said he didn't shoot no pizza man but I was there." Id. at *18.

Boseman appealed his guilty verdict and sentence to the South Carolina Supreme Court, which affirmed the conviction. Thereafter, Boseman filed a state application for post-conviction relief, asserting numerous ineffective assistance of trial counsel claims.

The state post-conviction relief court ("PCR court") held an evidentiary hearing on the application, during which Boseman's brother, Walter Boseman ("Walter"), testified that he and three of his college friends hung out together at the Boseman home on the evening of October 31, 1995. Walter averred that he and his friends and Boseman went to a convenience store (the same store where Griffis went after being shot) to purchase beer around 8:30 p.m. They returned directly to the house, where they remained until he and his friends returned to college in Orangeburg shortly after 10:15 p.m.[1] He also testified that although he had tried to locate his three friends prior to the

---

[1] Walter testified that although one of his college friends returned to the convenience center later in the evening to purchase more beer, he, two of his friends, and Boseman did not leave the house again until he and his friends left town.

PCR court hearing, they had lost touch after college, and he had not been able to locate them.

Boseman's sister, Shalonda Boseman, testified that she returned to the Boseman house between 10:00 p.m. and 10:30 p.m., and went to her bedroom. She stated that about "fifteen minutes" after she arrived home, Boseman entered her bedroom and they chatted for a while.

Boseman introduced into evidence a report ("the Rickborn report") prepared for Boseman's trial counsel prior to the first trial by private investigator Patti Rickborn. The Rickborn report documents her interview with Walter:

> I asked Walter how he recalled [what] times of the evening that he was with [Boseman]. He told me that he checked his watch on a regular basis that evening because even though he and his friends were partying they had to be back at S.C. State that evening. He looked at his watch when the client was dropped off at 8:30 p.m. because they were going to the store for more beer and he was keeping track of how much more time they had to drink beer. He knows that he left between 10:00 p.m. – 10:30 p.m. because they were just going to have time to pick up some other S.C. State students who were at a party at Benedict College and get back to the S.C. State campus by 11:30 p.m. – 12:00 a.m. (Midnight).

J.A. 792.

Boseman's trial counsel, Doug Strickler, also testified at the PCR hearing.[2] He stated that in addition to the interviews

---

[2] We will refer to Strickler as "trial counsel" so as to avoid confusion with Strickland.

conducted by his private investigator, he had personally interviewed several of the alibi witnesses, including Walter. He considered presenting the alibi defense during the trial. In addition, he filed a notice of alibi and arranged for Walter to be present during, but sequestered from, the trial proceedings in case he decided to call Walter as a defense witness. Trial counsel further stated that he had several reservations about presenting an alibi defense and had discussed those concerns with Boseman. He testified there were three reasons he ultimately decided not to present the defense: (1) he felt the evidence did not provide a complete or "classic" alibi for the entire period in question[3]; (2) he was concerned because the potential alibi witnesses were related to Boseman; and (3) under South Carolina law, he would have forfeited the right to make the last argument to the jury had he presented a defense.[4]

---

[3] When questioned about Walter and his friends' departure time, which the Rickborn report indicated was between 10:00 and 10:30 p.m., trial counsel averred that his notes from interviews with the students indicated they left "at a different point in time," closer to 9:30 p.m. Trial counsel could not locate his notes of those interviews, however, and the notes were not entered into evidence.

[4] South Carolina's procedural rules permit counsel of a defendant who calls no witnesses and offers no evidence to have the concluding argument to the jury. See State v. Mouzon, 467 S.E.2d 122, 125 (S.C. Ct. App. 1995).

The PCR court denied Boseman's petition. It first laid out the two-part standard for establishing ineffective assistance, as articulated in Strickland and applied in subsequent state cases. It then concluded:

> [T]he Applicant must prove that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result."
> The proper measure of performance is whether the attorney provided representation within the range of competence required in criminal cases. Courts presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. The Applicant must overcome this presumption to receive relief.
> . . . .
> . . . Trial counsel articulated that he did prepare for this case and in fact tried it twice. Counsel investigated this case, interviewed potential witnesses, and hired an investigator. . . . Counsel testified that he had considered putting up the witnesses provided to him by the Applicant, but was concerned about the partial or incomplete nature of the alibi to which they would testify. Counsel recalled that he had discussions with the Applicant concerning this and that this concern combined with the chance to argue to the jury last resulted in the decision not to put up these witnesses.
> . . . .
> Where trial counsel articulates a valid reason for employing certain trial strategy, such conduct should not be deemed ineffective assistance of counsel. Roseboro v. State, 317 S.C. 292, 454 S.E.2d 312 (1995). The Applicant has not shown that counsel was deficient in his choice of tactics. A defense counsel is not ineffective for making valid trial strategy decisions. Caprood v. State, 338 S.C. 103, 525 S.E.2d 514 (2000).

11

J.A. 797-99 (citations omitted). Boseman's petition for writ of certiorari to the South Carolina Supreme Court was denied. J.A. 827-29.

Boseman then filed a timely petition under 28 U.S.C. § 2254 for a writ of habeas corpus in the United States District Court for the District of South Carolina. The Warden moved for summary judgment. The case was referred to a magistrate judge who entered a report recommending denying Boseman's petition and granting summary judgment to the Warden.

The district court rejected the magistrate's report and conditionally granted Boseman's petition.[5] The district court identified four reasons why the petition should be granted:

> First, the PCR court's decision was "contrary to" Supreme Court precedent because it applied a per se rule of reasonableness, rather than a presumption of reasonableness, to decisions counsel made pursuant to a "sound trial strategy." Second, the PCR court based its decision on the performance prong on an unreasonable determination of the facts by finding that trial counsel considered (rather than failed to consider) but decided not to call alibi witnesses for the purpose of showing petitioner was not at the Shelton residence when the phone call to Domino's Pizza was made. The PCR court's analysis on that point also involved an unreasonable application of Strickland. Third, the PCR court's decision involved an unreasonable application of Supreme Court precedent

---

[5] Boseman alleged four grounds of ineffective assistance, but because the district court granted the petition as to the first ground (failure to present witnesses in support of an alibi defense), it only addressed that issue. Accordingly, that is the only issue before the Court on appeal.

12

to the facts of petitioner's case because it determined that trial counsel's "decision" not to call alibi witnesses to address events that occurred during the time of the robbery/murder was part of a sound trial strategy. Finally, the PCR court's decision involved an unreasonable application of Supreme Court precedent to the facts of petitioner's case because it determined that the failure to call any alibi witnesses was not prejudicial.

Boseman, 2008 U.S. Dist. LEXIS at *43-44.

The Warden noted a timely appeal of the district court's judgment. J.A. 830. We have jurisdiction pursuant to 28 U.S.C. § 1291.

II.

We review de novo the district court's decision to grant Boseman's § 2254 petition, applying the same standards as the district court. Whittlesey v. Conroy, 301 F.3d 213, 216 (4th Cir. 2002). Pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), however, our review of the relevant state court decision is very narrow. Jackson v. Johnson, 523 F.3d 273, 276 (4th Cir. 2008). In cases where a state court considered and denied a claim on its merits, a federal court may grant habeas relief only if the state court decision was "contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable

13

determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d)(1) and (d)(2).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000). And, a state court's decision involves an unreasonable application of federal law when the state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a particular] case," id., or "applies a precedent in a context different from the one in which the precedent was decided and one to which extension of the legal principle of the precedent is not reasonable [or] fails to apply the principle of a precedent in a context where such failure is unreasonable." Robinson v. Polk, 438 F.3d 350, 355 (4th Cir. 2006) (quoting Green v. French, 143 F.3d 865, 870 (4th Cir. 1998), overruled on other grounds by Williams, 529 U.S. 362). "The state court's application of clearly established federal law must be 'objectively unreasonable,' for a 'federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the

14

relevant state-court decision applied clearly established Federal law erroneously or incorrectly.'" Jackson, 523 F.3d at 277 (quoting Williams, 529 U.S. at 409, 411).

Under § 2254(d)(2), a federal court can also grant habeas relief to a state court judgment when the state court's determination of the facts was objectively unreasonable. However, a state court's determination of factual issues is presumed to be correct. § 2254(e)(1). Therefore, a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned unless the applicant rebuts the presumption of correctness by clear and convincing evidence. Id.; Miller-El v. Cockrell, 537 U.S. 322, 340 (2003); Cagle v. Branker, 520 F.3d 320, 323 (4th Cir. 2008).

## III.

The Warden appeals three aspects of the district court's opinion and judgment. First, the Warden contends that the district court should not have granted the petition based on a claim of ineffective assistance arising from trial counsel's failure to call alibi witnesses for the time of the telephone call because Boseman did not raise such a claim in the PCR proceeding. He then asserts the district court erred in concluding the PCR court applied a "per se rule of reasonableness" rather than a "presumption of reasonableness."

15

Lastly, the Warden contends the district court erred in concluding the PCR court unreasonably applied Strickland and made objectively unreasonable factual findings.

A.

As an initial matter, we reject the Warden's procedural default argument. The Warden asserts that because Boseman's state PCR petition did not raise a "separate, specific allegation" of ineffective assistance based on trial counsel's failure to present witnesses for the time of the telephone call to Domino's, the issue was procedurally defaulted and should not have been considered by the district court. (Appellee's Br. 34-44.)

Although the Warden raises a credible point, Boseman's arguments made in the state PCR court were sufficient to preserve the issue of calling an alibi witness at the time of the telephone call. As noted, Griffis was mortally wounded sometime within the approximately 45-minute period between the telephone call to Domino's, around 9:15 p.m., and Griffis' arrival at the convenience store by 10:00 p.m. Thus, the relevant period to which a witness could have provided Boseman with any alibi was narrow. Boseman's pro se PCR petition included the following question presented: "Was trial counsel ineffective for failing to present witnesses in support of an

16

alibi when [an] alibi was presented to the jury?" J.A. 706. During the state PCR court evidentiary hearing, Boseman's appellate counsel argued that witnesses could have provided Boseman with an alibi for the relevant period of time during which the murder and robbery occurred, as it was "an ongoing criminal enterprise." J.A. 726-27. Boseman identified at that time the same individuals he identifies at present as the witnesses trial counsel should have called to present an alibi defense. Lastly, the questioning of Walter during the PCR hearing detailed the purported alibi available for the entire relevant period, including the time of the telephone call. Moreover, trial counsel was questioned regarding his decision not to call an alibi witness to testify about any part of that period, specifically addressing an alibi for both the time of the telephone call and the time of the murder. Boseman's arguments to the PCR court thus arguably encompassed the entire period from the time of the telephone call through Griffis' arrival at the convenience store, and the failure of trial counsel to present an alibi defense for any part of that period. For these reasons, we hold that Boseman adequately preserved the issue for federal review.

B.

The Warden next contends the district court erred in concluding the PCR court applied a "per se rule of reasonableness" rather than a "presumption of reasonableness." In reaching that determination, the district court stated:

> In its brief discussion of Strickland's performance prong, the state court stated, "A defense counsel is not ineffective for making valid trial strategy decisions." The PCR court equated valid trial strategy decisions with reasonable performance, but Strickland does not go so far. Rather, Strickland held that decisions undertaken as part of an informed trial strategy are "virtually unchallengeable" in light of the "strong presumption" of reasonableness that arises in such cases. Strickland, 466 U.S. at 690. "Virtually unchallengeable" is not the same as actually unchallengeable . . . [and] even some "valid trial strategies" . . . may nonetheless fall outside the wide range of acceptable performance. By applying a per se reasonableness rule, the PCR court did not consider the next question, although almost always answered against the petitioner, of whether the trial strategy itself was unreasonable.

Boseman, 2008 U.S. Dist. LEXIS at *44-*46 (citation omitted). The district court thus concluded the PCR court had unreasonably applied Strickland. We disagree.

Strickland sets forth the standard for establishing a Sixth Amendment ineffective assistance of counsel claim. The first part of that standard requires a showing that trial counsel's performance was deficient, that is, that it "fell below an objective standard of reasonableness." 466 U.S. at 688. In making this assessment, "[j]udicial scrutiny of counsel's

18

performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." Id. at 689. This is so because "[t]here are countless ways to provide effective assistance in any given case [and] [e]ven the best criminal defense attorneys would not defend a particular client in the same way." Id. Moreover, the Supreme Court has recognized:

> Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Id. at 690-91.

To be sure, this language making strategic decisions by counsel "virtually unchallengeable," does leave room for such decisions to still be successfully challenged. However, we do not agree with the district court that the PCR court applied a per se rule of reasonableness.

The district court's decision is based on its specific criticism of the PCR court's use of the phrase "valid trial strategy." The district court read that phrase as reflecting

19

that the PCR court viewed trial counsel's decision on the alibi witnesses only as being made after appropriate investigation (i.e., was "strategic") and as failing to assess whether counsel's decision was reasonable. The PCR court's opinion does not support this conclusion.

The PCR court's opinion accurately set forth Strickland's presumption of reasonableness standard for assessing counsel's performance: "The proper measure of performance is whether the attorney provided representation within the range of competence required in criminal cases. Courts presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. The Applicant must overcome this presumption to receive relief." J.A. 797-98 (citations omitted). This language shows that the PCR court understood what Strickland required and that it was to afford only a presumption of reasonableness to counsel's conduct.

Only after articulating this standard and reviewing the reasons trial counsel proffered for his decision not to present an alibi, did the PCR court hold: "Where trial counsel articulates a valid reason for employing certain trial strategy, such conduct should not be deemed ineffective assistance of counsel. The Applicant has not shown that counsel was deficient in his choice of tactics. A defense counsel is not ineffective

20

for making valid trial strategy decisions." J.A. 799. (Citations omitted.) Using the phrase "valid trial strategy" indicates more than that the PCR court only believed that trial counsel made an informed decision, as the district court surmised. Rather, the PCR court's phraseology includes the qualitative assessment that the strategy was a "valid" one.

In context, counsel's "valid" trial strategy was equivalent to "reasonable" under a normal reading of those terms. Relevant definitions of the word "valid" include: "having legal strength or force" and "well grounded or justifiable." Webster's Third New International Dictionary 2529 (2002). These definitions support the conclusion that the PCR court properly undertook the full Strickland performance prong analysis by concluding that trial counsel's conduct was made after appropriate investigation (it was part of a "trial strategy") and that it was a reasonable choice to have made because that strategy had "legal strength or force" and was "well grounded or justifiable." In other words, determination that the trial strategy was "valid" in this case was equivalent and synonymous to saying it was a "reasonable" trial strategy."

This conclusion is bolstered by the numerous circuit courts of appeal that have used the term "valid" when referring to both the fact of and the reasonableness of counsel's conduct as part of the Strickland performance prong analysis. E.g., Lewis v.

21

Horn, 581 F.3d 92, 114 (3d Cir. 2009) ("A valid reason for [counsel's decision] not [to] present[] evidence is that it does not exist."); United States v. Culverhouse, 507 F.3d 888, 898 (5th Cir. 2007) ("Counsel may have had valid reasons not to raise the objections."); Morales v. Mitchell, 507 F.3d 916, 948 n.3 (6th Cir. 2007) ("In fact, it would have been a valid trial strategy-not deficient performance-for Morales's trial counsel to decline to present Morales's post-conviction evidence had he known of its existence."); Raley v. Ylst, 470 F.3d 792, 801 (9th Cir. 2006) ("we hold that [counsel's] decision was a valid strategic choice warranting judicial deference."); Thai v. Mapes, 412 F.3d 970, 978-79 (8th Cir. 2005) ("[Defendant] had the burden of proving that his lawyer's performance was unreasonable under prevailing professional standards, and that his lawyer's actions were not valid trial strategy."); Bullock v. Carver, 297 F.3d 1036, 1047 (10th Cir. 2002) ("[T]he defendant [has] the burden of showing that counsel's action or inaction was not based on a valid strategic choice.").

The PCR court's use of the phrase "valid trial strategy" simply does not transform its analysis into a per se rule of reasonableness. As detailed above, the whole of the PCR court's opinion shows that it understood Strickland and applied a presumption of reasonableness standard when analyzing Boseman's ineffective assistance claim. Accordingly, the district court

22

erred in holding the state PCR court's analysis applied a per se rule of reasonableness and was therefore contrary to or an unreasonable application of Strickland.

## C.

The Warden's final argument is that the district court erred in holding that the PCR court's decision denying Boseman's ineffective assistance claim was objectively unreasonable under Strickland and that "petitioner has shown that the PCR court was incorrect by clear and convincing evidence." The Warden contends the PCR court did reasonably apply Strickland in concluding that trial counsel's decision not to present an alibi defense was a strategic choice made after appropriate investigation. Furthermore, the Warden asserts the PCR court's factual findings were reasonable, both as to the nature of the alibi defense and the basis for counsel's decision not to present that defense.[6] (Appellant's Br. 50-60.)

---

[6] During oral argument, the Warden also contended that the district court's decision misconstrues South Carolina's law as to what constitutes an alibi defense. Citing Glover v. State, 458 S.E.2d 538 (S.C. 1995), the Warden asserted that presenting evidence of where Boseman was during the time of the telephone call does not provide Boseman with an alibi under South Carolina law for the time of the murder and robbery. See id. at 540 (holding that testimony placing the defendant at another location prior to the time of the crime was not sufficient to establish an alibi defense). Because we resolve the case in the (Continued)

In Strickland, the Supreme Court set out a two-prong test for evaluating ineffective assistance of counsel claims. A defendant must show: (1) that his counsel's performance did not meet "an objective standard of reasonableness," which is based on "prevailing professional norms," and (2) that his counsel's deficient performance prejudiced the defense. 466 U.S. at 687-88; Rompilla v. Beard, 545 U.S. 374, 380 (2005). "'Deficient performance' is not merely below-average performance; rather, the attorney's actions must fall below the wide range of professionally competent performance." Griffin v. Warden, 970 F.2d 1355, 1357 (4th Cir. 1992). To "eliminate the distorting effects of hindsight," this review of counsel's performance seeks to "reconstruct the circumstances of counsel's challenged conduct" and "evaluate the conduct from counsel's perspective at the time" his decision was made. Strickland, 466 U.S. at 689. As noted previously, a Strickland review of counsel's conduct is made with the strong presumption of reasonableness. Id.

When trial counsel's conduct is challenged for failing to present certain evidence, the inquiry is generally focused on whether the investigation supporting counsel's decision not to present certain evidence was reasonable. See Wiggins v. Smith,

Warden's favor on another basis, we need not address this argument.

24

539 U.S. 510, 521-23 (2003) (in context of limited scope of investigation into potential mitigating evidence); Wilson v. Ozmint, 352 F.3d 847, 860 (4th Cir. 2003) (same). "Strickland's objective reasonableness prong requires counsel to conduct appropriate factual and legal inquiries and to allow adequate time for trial preparation and development of defense strategies." Huffington v. Nuth, 140 F.3d 572, 580 (4th Cir. 1998). And "when evaluating decisions not to investigate further, [the court] must regard counsel's choice with an eye for 'reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" Bunch v. Thompson, 949 F.2d 1354, 1363 (4th Cir. 1991) (quoting Strickland, 466 U.S. at 691); cf. Turner v. Williams, 35 F.3d 872, 896 (4th Cir. 1994) (in the context of ineffective assistance of counsel claims, the court "address[es] not what is prudent or appropriate, but only what is constitutionally compelled."), overruled on other grounds by O'Dell v. Netherland, 95 F.3d 1214, 1222-23 (4th Cir. 1996).

We are also mindful of the additional measure of deference afforded under AEDPA to a state court's resolution of the habeas claims of state prisoners. Bell v. Cone, 543 U.S. 447, 455 (2005) (AEDPA requires "a highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." (internal

25

quotation marks and citation omitted)). Our review of the record leads us to conclude that the district court erred in finding the PCR court unreasonably applied Strickland and was based on an unreasonable interpretation of the facts surrounding trial counsel's decision.

At the forefront of the district court's analysis is its conclusion that "under any reasonable view of the evidence trial counsel premised their 'strategic' decision not to call witnesses for the time of the robbery/murder on an ill-informed and mistaken view of the facts of petitioner's case." J.A. 135. In so holding, the district court misconstrued the evidence presented during the PCR hearing and did not afford the proper level of deference to the PCR court's factual finding that trial counsel's interviews with the alibi witnesses "only established an incomplete or partial alibi for [Boseman] and did not give him an alibi for the actual time of the alleged incident." J.A. 796.

To support its conclusion that trial counsel's performance failed to meet the Strickland standard, the district court first cited trial counsel's reliance on "the Rickborn report, which stated that Walter and his college friends were with [Boseman] from 8:30pm until 10:00pm." J.A. 136. Based on this factual conclusion, the district court found trial counsel's trial strategy defective as based on factual error. However, the

26

Rickborn report does not say what the district court asserts that it says. The report, which summarizes Rickborn's interview with Walter in November 1996, states, in relevant part:

> I asked Walter how he recalled that [sic] times of the evening that he was with Brian. He told me that he checked his watch on a regular basis that evening because even though he and his friends were partying they had to be back at S.C. State that evening. He looked at his watch when the client was dropped off at 8:30 p.m. because they were going to the store for more beer and he was keeping track of how much more time they had to drink beer. He knows that they left between 10:00 p.m. – 10:30 p.m. because they were just going to have time to pick up some other S.C. State students who were at a party at Benedict College and get back to the S.C. State campus by 11:30 p.m. – 12:00 a.m. (midnight).

J.A. 792. Significantly, the Rickborn report does not state where Boseman was "dropped off" at 8:30 p.m. or what periods of time after 8:30 p.m. that Walter was actually with Boseman, if any.

Boseman and the district court both assert the Rickborn report states that Boseman was dropped off at his house around 8:30 p.m. and that Walter, his friends, and Boseman were together from that point in time until Walter left between 10:00 and 10:30 p.m. An equally fair reading, if not a more compelling reading, of the report's actual language is that Walter was with Boseman for undefined periods of the evening, Boseman was dropped off at an undisclosed location at 8:30 p.m., and that Walter and his friends were either out buying beer or

27

at the house until they left around 10:00 p.m.  Where Boseman was during that time period is simply not determinable from the Rickborn report.  The report does not set forth the straightforward complete alibi that the district court erroneously credits to it.  Therefore, Boseman has failed to meet his burden under AEDPA that there was clear and convincing evidence that trial counsel misconstrued the nature of the potential alibi at the time he was deciding whether to present an alibi defense.

The district court also called into question trial counsel's "reference to the same amorphous 'handwritten note' [from trial counsel's own interviews with the potential alibi witnesses], which indicated that the alibi witnesses left Boseman's house at 9:30pm."[7]  J.A. 136.  The district court dismissed the importance of this evidence because trial counsel testified that he relied "solely" on the Rickborn report in

---

[7] The district court clearly viewed trial counsel's notes skeptically, subsequently referring to it as the "mysterious 'handwritten note'" that counsel purportedly possessed from his own interviews with the potential alibi witnesses.  J.A. 136. However, the PCR court implicitly found counsel's testimony about his notes credible by finding that he conducted an adequate investigation and that the investigation revealed the existence of an incomplete alibi.  The district court could not overturn the state court's credibility judgment unless Boseman presented clear and convincing evidence that trial counsel was not credible.  See Buckner v. Polk, 453 F.3d 195, 204 n.8 (4th Cir. 2006).  As discussed above, Boseman has not satisfied this burden, and presented no evidence to negate trial counsel's recollections of his note and its contents.  The district court thus erred in rejecting the PCR court's finding.

deciding whether to present an alibi defense, and the district court thought the report provided a complete alibi. However, as noted above, the Rickborn report fell far short of providing a complete alibi to Boseman. More importantly, the assertion that trial counsel relied "solely" on the Rickborn report in making his decision mischaracterizes trial counsel's PCR hearing testimony.

Trial counsel acknowledged that he would have "bas[ed] any decision" he made about the alibi defense on the Rickborn report. J.A. 736. But trial counsel never indicated that the Rickborn report was the only basis for this decision. During the same exchange, trial counsel repeatedly referred to the fact that in addition to the information provided in the Rickborn report, he had conducted his own interviews with the witnesses, and the information reported in his notes of those interviews conflicted with the information in the Rickborn report.[8] Specifically, counsel had "different times reflected" as to when Walter and his friends departed the Boseman house. J.A. 736.

---

[8] We also note that the Sixth Amendment does not always compel counsel to undertake interviews and meetings with potential witnesses where counsel is familiar with the substance of their testimony. E.g., Huffington, 140 F.3d at 580. Here, trial counsel's knowledge of the alibi was based not only on his private investigator's report summarizing her interview with one of Boseman's potential alibi witnesses, but also his own interviews of "at least some" of those witnesses.

Trial counsel unequivocally testified that both the report and his own interviews established only a partial alibi, and that this was one reason he decided not to present an alibi defense. Counsel's testimony thus provided the PCR court with evidence regarding the nature of his investigation into the available alibi defense, the conclusion that it was an incomplete alibi, and counsel's subsequent decision not to present an incomplete alibi defense. For these reasons, the district court erred in concluding that clear and convincing evidence did not support the PCR court's finding that only a partial alibi defense was available.

Having concluded that the PCR court "grounded its decision" on" an incorrect view of the facts, the district court held that the PCR court unreasonably applied Strickland in finding trial counsel's performance was reasonable. J.A. 135-37. The district court's review of the reasonableness of the PCR court's application of Strickland's performance prong was therefore inextricably linked to its own erroneous view of the factual conclusions regarding the nature of the potential alibi evidence. Without reading more into the Rickborn report than what it states, there was no basis for concluding that trial counsel ignored or should have known that a credible alibi existed for either the time of the telephone call or the murder and robbery. Counsel does not render deficient performance for

failing to present evidence of something that does not exist, nor is it necessarily deficient to decide not to present every potential defense. See e.g., Wiggins, 539 U.S. at 521-25 (discussing adequate performance investigating potential evidence to present prior to making a "strategic" decision not to present that evidence); Darden v. Wainwright, 477 U.S. 168, 186-87 (1986) (discussing reasons why counsel's decision not to present certain evidence that was potentially damaging was not deficient performance); Lewis v. Horn, 581 F.3d 92, 114 (3d Cir. 2009) ("A valid reason for [counsel's decision] not [to] present[] evidence is that it does not exist."); Byram v. Ozmint, 339 F.3d 203, 209-10 (4th Cir. 2003) (finding no ineffective assistance where counsel conducted adequate investigation and made strategic decision not to present evidence that could have been viewed favorably or unfavorably by the jury).

Here, the evidence supports trial counsel's statements during the PCR hearing that he investigated and considered presenting an alibi defense. He ultimately decided not to do so for several reasons related to specific defects in the alibi and procedural concerns regarding the conduct of the trial. Counsel also testified that he was concerned about the incomplete nature of the alibi. In addition, he was concerned because the principal alibi witness was a family member and presenting an

31

alibi defense would forfeit the right to make the last argument to the jury.  Significantly, in making the decision not to present the alibi defense, counsel discussed his concerns with Boseman, a fact Boseman has not disputed.[9]

The PCR court concluded that trial counsel exercised reasonable professional judgment regarding his decision not to present the alibi witnesses.  In light of Strickland's analysis of what constitutes reasonable performance as well as the deferential review afforded such state court decisions, we do not find error in the PCR court's conclusion.  Accordingly, we also hold that the district court erred in concluding the PCR court's decision was contrary to or an unreasonable application of Strickland's performance prong.[10]

---

[9] A defendant's consent to trial strategy is probative, although not determinative, of the reasonableness of the chosen strategy and of counsel's performance.  See Strickland, 466 U.S. at 691.

[10] In light of this conclusion, we need not address the district court's conclusion that the PCR court unreasonably applied the prejudice prong of Strickland when considering Boseman's claim.  A petitioner is required to prove both deficient performance and prejudice in order to succeed on an ineffective assistance claim.  Hunt v. Nuth, 57 F.3d 1327, 1332 (4th Cir. 1995).  Having failed to show deficient performance, Boseman's claim fails.

32

IV.

For the aforementioned reasons, we reverse the district court's judgment granting the writ of habeas corpus, and remand for further proceedings consistent with this opinion.

<u>REVERSED AND REMANDED</u>